**IMCO, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–782C.

United States Court of Federal Claims.

April 28, 1995.

Don A. Howard, Huntsville, AL, for plaintiff.

Laurel A. Loomis, with whom were Asst. Attys. Gen. Frank W. Hunger, David M. Cohen, and James M. Kinsella, Washington, DC, for defendant. Cpt. Maria Chapa, Army Litigation Div., Arlington, VA, and Hal Dilworth, Redstone Arsenal, AL, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to 28 U.S.C. § 1491(a)(3) (1988) for declaratory and injunctive relief. Plaintiff seeks to have the court overturn its debarment and reinstate a solicitation from which it was excluded. The matter is before the court on the parties' cross-motions for judgment under RCFC 56.1. Oral argument was held April 20, 1995. After considering the Debarment Administrative Record ("Administrative Record" or "DAR") and the parties' arguments, the court concludes that the defendant's motion should be granted and the plaintiff's motion should be denied.

## BACKGROUND

On December 21, 1992, the United States Army Missile Command ("MICOM") issued IFB DAAHO1–93–B–0001 ("B–0001") for the production of 127 Dummy HELLFIRE missiles and thirty Shoe Alignment Fixtures. The IFB was set aside for small businesses. On February 18, 1993, sixteen small businesses, including IMCO, submitted bids. In accordance with Federal Acquisition Regulation ("FAR") 9.106, pre-award surveys were conducted on all of the prospective contractors. The four lowest bidders, including IMCO, each received a no-award recommendation. The recommendation as to IMCO was based on the asserted facts that it did not have the technical, productive, or manufacturing capability to perform, and that it had a record of unsatisfactory performance.

After IMCO received its no-award recommendation in the pre-award survey, the matter was referred to the Small Business Administration ("SBA") pursuant to FAR 19.602. On January 3, 1994, the Atlanta regional office of the SBA notified the Contracting Officer ("CO") that it planned to issue a Certificate of Competency ("COC") to IMCO. By letter dated January 13, 1994, MICOM requested the SBA to reconsider its decision to issue the COC. On January 26, 1994, the Atlanta office reaffirmed its decision. On February 3, 1994, MICOM appealed the proposed issuance of the COC to the SBA's Washington D.C. office.

While the missile procurement and SBA review were underway, a separate procedure regarding IMCO was initiated. On August 4, 1993, Ms. Diane Landtroop, Chief, Procurement Division D, Acquisition Center, MICOM, recommended to the United States Army Procurement Fraud Division ("PFD") that IMCO, along with Jerry Ikard, President of IMCO, and a related company, Ikard

Mfg. Co.,[1] be debarred from further contracting with the United States Government and all of its agencies.

Jerry Ikard and Ikard Mfg. Co. had both previously been debarred in 1984 for approximately eighteen months. In addition, based upon the recommendation of Ms. Landtroop, IMCO was previously debarred from April 23, 1990, through October 18, 1991, for what was termed a "history of failure to perform one or more contracts." That debarment was predicated on twenty-two default terminations and "delinquent performance on a number of other contracts."

The contract default terminations made the basis of the 1990 debarment were appealed either to this court or the Armed Services Board of Contract Appeals ("ASBCA"). Of these appeals, all were either settled in June 1994, on the government's agreement to convert the terminations for default to terminations for convenience, or they are still pending before the ASBCA. IMCO later received approximately $600,000 as a result of the court settlement.

On April 11, 1994, the PFD also recommended that IMCO be debarred. PFD's basis for the recommendation was IMCO's failure to perform on nine of fifteen purchase orders between April 30, 1992, and November 30, 1992.

On April 13, 1994, Brigadier General Thomas Cuthbert ("Gen. Cuthbert"), the Suspension and Debarment Official, sent IMCO a letter notifying it of the proposed debarment. This letter explained that the specific causes for the proposed debarment were allegations that IMCO "willfully" failed to perform nine purchase orders valued at $106,030, that it had a history of failure to perform one or more contracts, and that it had intended "to use the performance of these contracts [the nine purchase orders] to obtain payment on unrelated contracts or vice versa which evinces IMCO's and Mr. Ikard's lack of integrity." (DAR 13–17). IMCO was also advised that it had the right, within thirty days after receipt of the letter, to submit in person, in writing, or through a

representative, information and argument in opposition to the suspension, including any specific information that raised a genuine dispute of material fact.

On April 19, 1994, MICOM informed the SBA that IMCO had been proposed for debarment. The SBA subsequently suspended the COC process.

Under FAR 14.404–2(h), the CO must reject a bid from a contractor who has been proposed for debarment. After IMCO became ineligible for the award of the contract, the CO determined that the next lowest bidder, Tartan Industries, had gone out of business and that the remaining twelve bids were unreasonably high and not in the best interests of the government. On June 16, 1994, the CO determined that cancellation of B–0001 was in the government's best interest. On July 20, 1994, an amendment to the IFB was issued, cancelling the contract.

After receiving two extensions of time from the government, IMCO presented a written response to its proposed debarment on July 14, 1994. IMCO stated that its and Ikard Mfg. Co.'s actual delinquency rates were both less than ten percent; that any prior lapses were due to financial difficulties; that those financial difficulties in turn were caused by MICOM's de facto debarment, its withholding monies justly due IMCO, and its attempts to sabotage settlement negotiations on the twelve then-pending Court of Federal Claims cases; that numerous technical problems and drawing errors had contributed to delays in contract performance; and that it was then presently a responsible contractor.

Under Army procedures, Gen. Cuthbert had thirty days from the time IMCO submitted its matters in opposition within which to make a determination of whether a genuine dispute of material fact existed. IMCO was advised that it would have a right to present oral testimony. On July 29, 1994, IMCO notified the PFD that it would not present oral testimony unless a comprehensive fact-finding hearing was held.

1. Ikard Mfg. Co. and Jerry Ikard were originally named as plaintiffs. The court granted defendant's motion to dismiss as to these parties.

They had no standing because they did not submit bids.

On September 13, 1994, IMCO was notified by the PFD that the time for making a decision on the proposed debarment had been extended for thirty days for "good cause." By letter dated September 16, 1994, IMCO was informed by Gen. Cuthbert that he had found no genuine disputes of material fact were generated between the proposed debarment and IMCO's opposition materials and that IMCO was being debarred through April 13, 1997, pursuant to FAR 9.406. The decision was more narrowly tailored than the proposed debarment. There was no finding of willful failure to perform. Instead, Gen. Cuthbert found that based on all nine purchase orders there was sufficient evidence of IMCO's failure to perform, that the contractor had demonstrated a history of failure to perform or unsatisfactory performance of, one or more contracts, or alternatively that its performance constituted a cause of so serious or compelling a nature that it affected IMCO's present responsibility as a government contractor.[2] Jerry Ikard, individually, and Ikard Mfg. Co., were also debarred as affiliates of IMCO.

The HELLFIRE Dummy missiles that were to be supplied under B–0001 are still a valid Army requirement. In an effort to procure these missiles, MICOM issued RFP DAAH01–95–R–0029 on December 21, 1994, with a closing date of February 21, 1995. In its order of December 15, 1994, this court ordered that no award be made pursuant to the new RFP until resolution of IMCO's current claims.

## ISSUES PRESENTED

The parties' RCFC 56.1 cross-motions for judgment raise the following four issues:

1. Should the Administrative Record be supplemented?

2. Was IMCO denied its procedural due process rights in the debarment proceedings?

3. Was Gen. Cuthbert's decision to debar IMCO arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law?

4. Was the cancellation of B–0001 a breach of the government's implied contractual duty to consider IMCO's bid fairly and honestly?

## ANALYSIS

### I. Scope and Standard of Review

■ An immediate question that arises is whether the decision to cancel the procurement should be sustained on the straightforward basis that IMCO was proposed for debarment at the time the bids were being considered. Because it was proposed for debarment, IMCO was not eligible for award. The court earlier rejected this argument, however, when it was made one of the bases of defendant's motion to dismiss. While the question of the validity of a debarment decision, in isolation, could not be reviewed in this court, here the debarment proceedings were brought within the scope of review because the proposed debarment was the basis for eliminating IMCO from the competition. The validity of the debarment, therefore, is inextricably linked with the procurement. Meaningful relief could not be granted unless the court considers the debarment. Moreover, as in *ATL, Inc. v. United States,* 736 F.2d 677, 682 (Fed.Cir.1984), the procuring entity was directly involved in the debarment process. *See also, Electro–Methods, Inc. v. United States,* 728 F.2d 1471, 1475 (Fed.Cir. 1984); *Sterlingwear of Boston, Inc. v. United States,* 11 Cl.Ct. 517, 524 (1987).

■ The court holds, therefore, that IMCO may argue that its contractual entitle-

---

2. FAR 9.406–2 lists the causes for which a government contractor can be debarred. For the purposes of these motions for judgment, the relevant portions of this FAR provision state:

> (b) The Debarment Official may debar a contractor, based upon a preponderance of the evidence, for—
> > (1) Violation of the terms of a Government contract or subcontract so serious as to justify debarment, such as—
> > > (i) Willful failure to perform in accordance with the terms of one or more contracts; or
> > > (ii) A history of failure to perform, or unsatisfactory performance of, one or more contracts.
> > (c) Any other cause of so serious or compelling a nature that it affects the present responsibility of a Government contractor or subcontractor.

FAR 9.406–2(b) and (c).

ment to a full, fair, and honest consideration of its bid was breached by a debarment that was arbitrary, capricious, not in accordance with law, or not based on substantial evidence. The court's role in this respect is limited, however. The arbitrary and capricious standard is highly deferential and assumes the validity of agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys. Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *see also, Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

## II. *Supplementation of the Administrative Record*

IMCO asks the court to consider, in addition to the Administrative Record, the previously filed depositions[3] of Gen. Cuthbert, Cpt. Driano, and Ms. Landtroop, a redacted telephone facsimile sent by Ms. Landtroop to the PFD on May 3, 1994, a redacted "chronology" of events in IMCO's debarment prepared by Cpt. Driano, and an affidavit of Jerry Ikard. IMCO argues that relevant information was ignored, that the depositions and documents show that there were improper contacts between the procuring office and the PFD, and that the existing record is inadequate to reflect the real reasons for the Debarment Official's choices or the factors upon which the debarment decision was predicated. IMCO also contends that not every statement in the Debarment Decision Memorandum can be substantiated by reference to the Administrative Record.

■ Generally, where agency action has been challenged, court review is limited to the existing administrative record. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). In certain limited circumstances, however, supplementation of the administra-

tive record may be permitted. Exceptions to the general rule have been recognized under the following circumstances:

1. When agency action is not adequately explained in the record before the court;

2. When the agency failed to consider factors which are relevant to its final decision;

3. When an agency considered evidence which it failed to include in the record;

4. When a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

5. In cases where evidence arising after the agency action shows whether the decision was correct or not;

6. In cases where agencies are sued for failure to take action;

7. In cases arising under the National Environmental Policy Act; and

8. In cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir. 1989); *see also, Bradley v. United States*, 26 Cl.Ct. 699, 701 (1992). To the extent these exceptions are implicated, the court will consider the items offered.

IMCO argues that the May 3, 1994 telephone facsimile from Ms. Landtroop to the PFD must be added to the Administrative Record because it attaches "relevant" documents and information that should have been considered by Gen. Cuthbert in making his debarment decision. These documents include: a memorandum from Ms. Landtroop to the PFD regarding her recommended debarment of IMCO, portions of the pre-award survey for B–0001, and a letter dated January 13, 1994, from Leroy Williams, a MICOM Contracting Officer, to the SBA. According to IMCO, the Williams letter is the most important document in this facsimile because it demonstrates the existence of exculpatory information which was not considered by Gen. Cuthbert in his debarment determination, specifically, SBA's view that IMCO's past performance problems were due to lack

---

**3.** The court permitted limited discovery, with a view to permitting plaintiff to establish whether the Administrative Record should be supplement-

ed, or whether the decision-making process was materially flawed.

of payment on other government contracts and that the future looked more promising.

In regard to Cpt. Driano's "chronology" of IMCO's debarment, IMCO asserts that it must be added to the Administrative Record because it shows the extent of communications between the PFD and MICOM which amounted to "ex parte" or one-sided fact finding. In addition to showing the lack of objectivity that was present throughout the debarment proceedings, IMCO argues that this chronology is important because it demonstrates that the main issues raised in its opposition materials were not addressed in the debarment decision.

IMCO also seeks to have a new affidavit of Jerry Ikard added to the Administrative Record in order to reflect that two months prior to the debarment decision, IMCO filed actions in this court challenging the terminations for default that were the basis of the proposed debarment. IMCO alleges that this fact was not forwarded to the PFD or the Debarment Official, even though MICOM was fully aware of the existence of these legal challenges.

IMCO argues that the three depositions must be added to the Administrative Record because they elucidate the Army's "rationale" for the debarment. In addition, IMCO contends that these depositions demonstrate that information indicating the existence of genuine disputes of fact was ignored, information provided by IMCO was not verified, matters outside the Administrative Record were considered, and that issues of credibility concerning both MICOM and IMCO were ignored. In particular, Gen. Cuthbert's deposition shows that he relied upon the previous debarments and had doubts about the severity of IMCO's performance problems, Ms. Landtroop's deposition shows her extensive involvement in the debarment proceedings, and Cpt. Driano's deposition shows the level of communications between MICOM and the PFD.

■ After reading each of the documents which IMCO seeks to have added to the record, the court concludes that supplementation of the Administrative Record is not warranted. The court finds that no "relevant" information was ignored by Gen. Cuthbert and that the reasons for the decision to debar IMCO are clearly expressed in the Debarment Decision Memorandum and can be traced to the existing Administrative Record. Although the depositions indicate that there were contacts between MICOM and the PFD, to the extent these communications pre-date the PFD's proposed debarment, the court sees no error. IMCO is unable to cite any statute or regulation that is arguably violated by such communications. To the extent they post-date the proposed debarment, there is no evidence that these communications reached the eyes or ears of Gen. Cuthbert.

The pre-award survey is already in the record, having been furnished by IMCO in its response to the proposed debarment. Likewise, the July 14, 1994 letter to General Cuthbert from IMCO's counsel, already contained the statement that the two default-terminated contracts were going to be appealed. The negative inferences to be drawn from the Driano chronology can, as counsel conceded at oral argument, be drawn from the debarment decision itself. The substance of the other submissions, such as the Land-troop memo and the letter to the SBA, is contained in other materials such as the initial Ikard affidavit, and is, in any event, irrelevant or its omission is non-prejudicial. At no point does IMCO argue that it was ignorant of some contention communicated by MICOM to the PFD. The SBA's views are not relevant. The role of the SBA is very different than that of the PFD, as is the nature of their respective inquiries. It is apparent from reviewing the COC materials that the SBA, in large measure, simply accepted IMCO's contentions. The fact that it was persuaded of IMCO's responsibility, in the context of the B–0001 procurement, is not a bona fide "fact" that Gen. Cuthbert had to consider.

Finally, the court notes that it has read the three depositions at issue, as well as the proffered documents. Even if considered by the court, they would not affect the result.[4]

4. While General Cuthbert does indicate that he was "troubled" by the prior debarments, it is

III. *Procedural Due Process*

IMCO contends that the debarment decision should be vacated because it was denied procedural due process. According to IMCO, Gen. Cuthbert erroneously found that there were no genuine disputes of material fact and thereby denied it the opportunity to confront its accusers and attempt to demonstrate that there were issues of credibility as to various MICOM personnel who recommended its debarment. IMCO argues that a cursory review of the proposed debarment and its response materials demonstrates the existence of several "glaring" disputes of fact. Specifically, these asserted disputes include:

1. IMCO's performance and delinquency rate on the number of contracts it had been awarded through May 1994. Was the number of contracts fifteen as alleged by Landtroop or 165 for IMCO and fifty-three for Ikard Manufacturing Company as set forth in IMCO's response to the debarment?

2. Was the IMCO failure to perform the two purchase orders MICOM terminated for default without IMCO's fault or negligence, or did MICOM cause, or contribute to, that failure to perform?

3. Was IMCO a responsible contractor? The SBA said yes, but MICOM said no.

4. What was the true nature of IMCO's financial condition? Was it as stated in the Debarment Decision Memorandum, relying on information from September 30, 1992, or as of July 31, 1993?

5. Who was credible, Diane Landtroop or IMCO? Whose statements could be substantiated by factual information?

Plaintiff's Motion for Judgment Pursuant to Rule 56.1 at 22.

The procedural requirements of a debarment proceeding are governed by FAR 9.406–3. According to subparagraph (b), entitled "Decisionmaking process," agencies are required to provide the following procedural safeguards:

(1) Agencies shall establish procedures governing the debarment decisionmaking process that are as informal as is practicable, consistent with principles of fundamental fairness. These procedures shall afford the contractor (and any specifically named affiliates) an opportunity to submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment.

(2) In actions not based upon a conviction or civil judgment, if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the proposed debarment, agencies shall also—

(i) Afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents. . . .

FAR 9.406–3(b).

At the time of IMCO's proposed debarment, the Army, as directed by FAR 9.406–3(b), had established and implemented the "Army Debarment and Suspension Procedures." According to these procedures:

There are two distinct proceedings which may be involved in the suspension or debarment process. The first is the presentation of matters in opposition to the suspension or proposed debarment by the contractor. The second is fact finding, which occurs only in cases in which the contractor's presentation of matters in opposition raises a genuine dispute over one or more material facts.

Defendant's Response to Plaintiff's Motion for Judgment Pursuant to Rule 56.1 and Cross–Motion for Judgment Pursuant to Rule 56.1 at Exhibit B.

■ The court is unpersuaded that IMCO's presentation of matters in opposition to the proposed debarment necessitated a hearing. With respect to IMCO's delinquency rate and the total number of contracts, the

---

clear from his decision memorandum that he relied on the non-performance of the nine purchase orders to sustain the debarment. To the extent consideration of the prior debarments affected the length of the debarment at issue, that

question cannot be addressed by the court. If the debarment is sustained, the proposed debarment remains as a bar to award of the contract to IMCO.

Debarment Official had plaintiff's figures before him. They were not seriously contested by MICOM or the PFD because the debarment proposal was based on the assumption, supported by FAR 406–2(b)(1)(ii), that debarment can be premised on performance relating to as little as one contract. The court can assume that IMCO's figures are correct and evaluate the validity of the debarment on that basis.

IMCO also argues that there exists a genuine dispute of fact in regard to its responsibility for failure to perform the two purchase orders upon which the debarment was based. Although IMCO had been terminated for default on both of these contracts, it contends that its failure to perform was caused by MICOM and therefore the default terminations were improper. It alleged that MICOM improperly withheld funds on other contracts and that the purchase orders at issue contained onerous quality verification ("QV") standards. At the time of the debarment decision, IMCO had filed actions in this court challenging these default terminations. Notwithstanding these pending legal challenges, Gen. Cuthbert concluded that IMCO should be debarred for its "history of nonperformance." IMCO argues that making this determination prior to resolution of its appeals clearly ignored a genuine dispute of fact and usurped this court's powers to determine the validity of the default terminations.

■ We disagree. The court will not review de novo the question of whether there was a material dispute of fact. That inquiry must be filtered at this stage through the prism of limited judicial review. The real issue is one of due process—whether IMCO had a right to cross-examine government witnesses. That determination, in turn, must be tempered by practical considerations. Due process is "not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti–Fascist Comm. v. McGrath*, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (concurring opinion) (cited in *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). The fact that Gen. Cuthbert had no independent role in relation to the appeals of the terminations for default must

be taken into account. His position is distinct from that of a court or a board. Nor is it inappropriate to take cognizance of the government's legitimate interest in promptly procuring military hardware. A delay of the debarment until the default termination appeals were resolved would be unreasonable.

■ The result may vary depending on the character and quality of the justification offered by the debarred contractor, and the court is unwilling to hold as a general proposition that it is never the role of the Debarment Official to undertake a more searching assessment of the propriety of a default termination. Given the nature of the argument and evidence with which he was confronted, however, the court holds that Gen. Cuthbert did not err in proceeding without first concluding that material facts were in dispute. IMCO's arguments against the validity of the default terminations were primarily of two kinds—financial inability and onerous quality verification requirements. It was not unreasonable for Gen. Cuthbert to conclude that the relevant evidence was primarily in written form and that IMCO's cross-examination of government witnesses on these matters was pointless. Lack of cross-examination did not preclude IMCO from offering its own witnesses to support those grounds. It chose not to accept that opportunity.

As discussed below, the QV standards were part of the contracts which were default terminated. It was not unreasonable for Gen. Cuthbert to find that the impact of such clauses on IMCO's inability to perform was, for his limited purposes, irrelevant. The clauses were either enforceable or not. If IMCO had made a serious argument against their enforceability, which it did not, it would primarily be a legal matter, not requiring evidence.

As to IMCO's financial condition and the impact of the then-ongoing settlement negotiations, the evidence was not materially in dispute. IMCO's argument was that it was disabled due to a lack of money. It contended that it would be in better financial condition once it got an expected settlement payment. The record before Gen. Cuthbert showed IMCO's financial condition up until July 31, 1993. Whether he was right or

wrong in accepting IMCO's argument about the impact of its financial condition on its performance of prior contracts, an issue considered later in this opinion, he was not unreasonable in concluding that nothing material would be gained by live testimony from government witnesses. The debarment was proposed based, *inter alia*, on written records as to two prior contracts, each reflecting a default. IMCO had the opportunity to present evidence contradicting or justifying the defaults on those contracts. Gen. Cuthbert was put into the position of either accepting or rejecting IMCO's explanation of the default.

IMCO also argues that its opposition materials raise a genuine dispute of fact regarding whether it was a "responsible" contractor at the time of the debarment determination. IMCO argues that in light of the SBA's determination that it was a "responsible" contractor and that MICOM had interfered with its contract performance, a dispute was created.

■ The court disagrees. The fact that a different government agency concludes that a contractor is responsible does not itself create a genuine dispute of fact. Whether or not a contractor is "responsible" is a determination which a Debarment Official is empowered to make. As referenced earlier, the SBA's and the Debarment Official's determinations of "responsibility" are based upon different factors and have different underlying purposes. The SBA determination is limited to one particular contract, while the Debarment Official's determination considers the responsibility of a contractor in regard to all its dealings with the government. In coming to his ultimate conclusion, Gen. Cuthbert was not obligated to attempt to resolve the apparent conflict between the SBA and the PFD staff as to this issue through an evidentiary hearing.

The fourth dispute of fact which IMCO contends was raised by its opposition materials involves the true nature of its financial condition at the time of its performance problems. The proposed debarment was based upon two pre-award surveys which included financial information that was current as of September 30, 1992. In its opposition mate-

rials, IMCO included the financial portion of the pre-award survey that was conducted for B–0001 which included financial data that was current as of July 31, 1993. All three surveys were thus available to Gen. Cuthbert. There is no dispute of fact, in any event, regarding the information contained in these three different surveys. The government does not challenge the veracity of the figures contained in the most recent survey which showed IMCO's decline in available funds. The real question posed by IMCO is, which data is most relevant? That question could be resolved from the record.

Lastly, IMCO argues that its opposition materials raised a genuine dispute of fact in regard to who was more credible, Ms. Landtroop or IMCO. This would only be relevant if the debarment decision turned on findings of credibility. It did not.

■ The court finds that IMCO was not denied its procedural due process rights. The debarment proceeding was conducted in compliance with the procedural requirements of FAR 9.406–3(b). IMCO was given an opportunity to submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment. IMCO chose to submit its opposition in writing. Moreover, because no genuine dispute of material fact was created by IMCO's opposition to the proposed debarment, no formal fact-finding hearing was required. Consequently, the fact that IMCO was not given an opportunity to cross-examine certain government officials does not constitute a violation of its procedural due process rights.

In addition, the fact that there were numerous substantive contacts between the PFD and the staff of MICOM, particularly Ms. Landtroop, does not warrant a finding that IMCO's procedural due process rights were violated. None of these contacts added to the substantive evidence considered by Gen. Cuthbert in his debarment determination. Nor can a procedural due process claim can be premised on the fact that Cpt. Driano and other PFD personnel possessed information not furnished to IMCO. As discussed above, these ex parte contacts do not

violate any statute or regulation, and the court is not convinced that the debarment process was tainted by these contacts, particularly in light of Gen. Cuthbert's deposition testimony that he based his debarment decision solely on the evidence in the Administrative Record.

## IV. *The Validity of IMCO's Debarment*

The proposed debarment arose out of IMCO's failure to perform nine purchase orders valued at $106,030. Gen. Cuthbert found that at least three of the purchase orders had been accepted by IMCO and that bilateral contracts were formed. This is not disputed by IMCO. Contract 0024 was entered into on September 30, 1992, and required delivery on April 26, 1993. Because IMCO did not deliver by that date, a Show Cause letter was sent to IMCO on May 3, 1993. By letter dated May 24, 1993, IMCO informed MICOM that it was unable to deliver because of a delay in the receipt of anticipated settlement funds. On June 9, 1993, the CO determined that contract 0024 should be terminated for default.

Contract 1256 was entered into on September 22, 1992, and required delivery on April 27, 1993. On April 14, 1993, IMCO informed the government that its delivery schedule was delayed and requested forbearance until the completion of settlement negotiations with the government on unrelated contract disputes. IMCO failed to deliver by April 27, and a Show Cause letter was sent on May 13, 1993. By letter of May 24, 1993, IMCO reiterated to MICOM that the delay was due to its failure to receive overdue settlement proceeds on other claims against the government. On July 1, 1993, the CO determined that contract 1256 should be terminated for default.

Gen. Cuthbert also found that IMCO accepted purchase order 0624 in writing, thus forming a bilateral contract, and then failed to comply with the agreed upon delivery schedule. Delivery on contract 0624 was due on March 25, 1993. On March 29, 1993, a Show Cause letter was sent to IMCO advising that the government was considering a termination for default based on its failure to perform. By letter dated April 14, 1993,

IMCO informed MICOM that its failure to deliver under this contract was due to its failure to receive funds under a settlement agreement it had anticipated between itself and the government regarding separate contracts. On June 2, 1993, the CO determined that contract 0624 should be cancelled at no cost to either party.

In regard to contracts 0024, 1256, and 0624, Gen. Cuthbert concluded that IMCO's conduct provided a basis to debar Mr. Ikard and IMCO pursuant to FAR subsections 9.406–2(b)(1)(ii) and 9.406–2(c).

With regard to the remaining purchase orders, 0627, 1155, 1157, 1167, 1283, and 1365, Gen. Cuthbert found that despite the fact that IMCO insisted that it did not accept these "purchase orders" there was sufficient evidence to suggest that it had accepted them and considered them to be bilateral contracts. He found that it was not necessary, however, to resolve this issue to make a determination as to IMCO's responsibility as a contractor. According to Gen. Cuthbert, IMCO failed to meet the delivery dates specified in these purchase orders, and except for purchase order 1365, IMCO failed to inform the government prior to the scheduled delivery date that it would be unable to deliver the products on time. Gen. Cuthbert concluded that IMCO's conduct with respect to these purchase orders provided a basis to debar Mr. Ikard and IMCO pursuant to FAR subsection 9.406–2(c), which permits debarment for any other cause so serious or compelling that it affects the present responsibility of the entity to be a contractor. Based on his findings as to all nine purchase orders, he approved the debarment on the more limited grounds and fixed the debarment period at three years, until April 13, 1997. A consideration of the record demonstrates that his findings and conclusions are supported.

IMCO was awarded purchase order 0627 on April 30, 1992. This purchase order called for IMCO to supply 105 Circuit Card Assemblies for a total cost of $14,773.50. The entire quantity was scheduled to be delivered on December 9, 1992.

By letter of September 8, 1992, MICOM requested that IMCO provide estimated can-

cellation costs that would be incurred if the purchase order quantity was reduced by thirty-seven items. In its September 28, 1992 response, IMCO stated that reducing the quantity by this amount would affect the line item minimum quantity and would result in a unit cost of $223 for a total of $15,028. IMCO suggested to the government: "You may wish to T for C this contract in its entirety which will result in a cost of $8,000 at this point." (DAR 60). The language used by IMCO in this letter suggests that it considered purchase order 0627 to be a contract.

IMCO failed to deliver the Circuit Card Assemblies on December 9, 1992. By letter of January 25, 1993, a proposed modification for purchase order 0627 was sent to IMCO for its signature. According to the government, Mr. Ikard stated that he would not sign the modification until the conclusion of negotiations with MICOM regarding other appeals.

By letter of May 24, 1993, IMCO requested a no cost cancellation of the purchase order. In this letter, IMCO explained: "Our ability to deliver these items has become seriously jeopardized by the failure of our main customer and ourselves to meet settlement schedules that we had depended upon. Accordingly we request that the order [0627] be cancelled at no costs." (DAR 57). On May 27, 1993, the CO determined that it would be in the government's best interest to execute a unilateral withdrawal of the offer. On June 2, 1993, the government withdrew its offer and cancelled the purchase order in its entirety at no cost to either party.

Purchase order 1157 was awarded to IMCO on July 30, 1992. This purchase order called for IMCO to supply thirteen Circuit Card Assemblies for a total cost of $2,639. The entire quantity was scheduled to be delivered on March 31, 1993.

On January 20, 1993, MICOM received IMCO's request for procurement cancellation costs. By letter of January 27, 1993, MICOM requested an estimate of cancellation costs from IMCO. IMCO's February 17, 1993 response stated: "Cancellation costs on the above contract [1157] will be approximately 55% if we receive notification by close

of business on 18 February 1993. If you chose to cancel it at a later date, the cost will be 100%." (DAR 88). This language suggests that IMCO considered purchase order 1157 to be a contract.

IMCO failed to deliver the Circuit Card Assemblies on March 31, 1993. On both April 6 and 14, 1993, a MICOM contract specialist telephoned Mr. Ikard to check on the status of delivery. By letter of May 24, 1993, IMCO requested a no cost cancellation. In this letter, IMCO explained: "Our ability to deliver these items has become seriously jeopardized by the failure of our main customer and ourselves to meet settlement schedules that we had depended upon. Accordingly we request that the order [1157] be cancelled at no costs." (DAR 86). On June 10, 1993, the government executed a withdrawal of the offer and cancelled purchase order 1157 in its entirety at no cost to either party.

Purchase order 1155 was awarded to IMCO on July 31, 1992. This purchase order called for IMCO to supply thirty Cable Assemblies for a total cost of $22,080. The entire quantity was scheduled to be delivered by February 20, 1993.

IMCO failed to deliver the Cable Assemblies on February 20, 1993. On February 24, 1993, a Show Cause letter was sent to IMCO notifying it of its failure to timely deliver the required items and requesting it to provide information regarding the reasons for this nonperformance. No response from IMCO was received.

On March 30, 1993, Lisa Bedingfield, a MICOM contract specialist, contacted Mr. Ikard to discuss the delinquency of purchase order 1155. Although Ms. Bedingfield attempted to negotiate a new delivery schedule with Mr. Ikard, no such agreement was reached. According to Ms. Bedingfield, Mr. Ikard refused to agree to a new delivery schedule because:

he has another purchase order with quality verification samples at MICOM's lab for testing which he could not get paid on, therefore this was holding up his work and until he found out whether or not these items passed, which he stated would not be

until May 93, that he would not perform any of MICOM's purchase orders with quality verification samples, which would include this purchase order [1155]. He stated, that if these items do not pass, he would request a no cost cancellation on this purchase order, as well as any other MICOM purchase orders with quality verification sample required, because they tied his money up for too long.

(DAR 106, 111).

By letter of April 14, 1993, IMCO requested forbearance on purchase order 1155. In this letter, IMCO explained:

Reference is made to Contract No. DAA-HO1–92–P–1155.

The delivery schedule on this contract was due on 20 February 1993. We are sorry to inform you that the schedule has become somewhat delayed. . . .

At the time this contract was awarded, the government had scheduled claims settlement negotiations with IMCO ... which were due to be completed in January 1993. The negotiations on these contracts, as a minimum, would have resulted in payment by the Government to Ikard/IMCO of several hundred of thousands of dollars. Both the Government and Ikard/IMCO believed that settlement and payment would be completed by January 1993; February at the latest. Negotiations have been rescheduled several times, the current date being 19 May 1993.

Since IMCO had anticipated receipt of payment from the Government, other contract financing arrangements were not pursued in a timely manner. It now appears that reliance was misplaced.

We believe that our reliance upon timely receipt of payment was reasonably placed. We believe also that the delay was occasioned by the Government, and as a consequence was beyond our control and without our fault or negligence.

We expect to be able sometime within the next 60 days to give you definite information as to the exact amount of delay that we have experienced. In the meantime, forbearance is requested for the reasons above.

(DAR 112). As with the purchase orders and IMCO correspondence discussed above, the language used by IMCO in this letter suggests that it considered purchase order 1155 to be a contract.

By letter dated May 24, 1993, IMCO requested that purchase order 1155 be cancelled at no cost. The CO determined that it would be in the government's best interest to execute a unilateral withdrawal of the purchase order and cancel the contract in its entirety at no cost to either party. These actions were taken by the Government on June 9, 1993.

IMCO was awarded purchase order 1167 on August 4, 1992. This purchase order called for IMCO to supply thirty-one Circuit Card Assemblies for a total cost of $5,750.50. The entire quantity was scheduled to be delivered on February 13, 1993.

IMCO failed to deliver the Circuit Card Assemblies by February 13, 1993. On February 24, 1993, Ms. Diana McCown, MICOM contract specialist, telephoned Mr. Ikard regarding the delinquent delivery. According to Ms. McCown, Mr. Ikard stated that he was having some problems with his quality verification tests at the MICOM lab on another contract and that he would probably request a "no cost" cancellation on all of his contracts with QV clauses. On March 16, 1993, Ms. McCown again contacted Mr. Ikard regarding the delivery status of purchase order 1167. Mr. Ikard stated that "he would not know anything on delivery until the Department of Justice and his company negotiated some outstanding appeals on other contracts. He stated if they settle, he would either request a no cost cancellation or negotiate an extension." (DAR 131, 134).

By letter of March 26, 1993, MICOM requested that IMCO provide estimated cancellation costs in the event that all thirty-one items were cancelled. IMCO responded by letter of April 14, 1993, in which it stated: "If this contract [1167] were to be cancelled within the next 30 days, the cancellation costs are estimated to be $1800." (DAR 131, 136). In another letter dated that same day, IMCO requested forbearance from MICOM in regard to "Contract No. DAAHO1–92–P–1167." (DAR 131, 135). The language used

by IMCO in these two letters indicates that it considered this purchase order to be a contract.

By letter dated May 24, 1993, IMCO requested that purchase order 1167 be cancelled at no cost. In this letter, IMCO explained: "Our ability to deliver these items has become seriously jeopardized by the failure of our main customer and ourselves to meet settlement schedules that we had depended upon. Accordingly we request that the order [1167] be cancelled at no costs." (DAR 137). On June 1, 1993, the government executed a unilateral withdrawal of the offer and cancelled the purchase order in its entirety at no cost to either party.

Purchase Order 1283 was awarded to IMCO on September 18, 1992. This purchase order called for IMCO to supply six Harness Assemblies for a total cost of $8,583. The entire quantity was scheduled to be delivered on March 31, 1993.

IMCO failed to deliver the Harness Assemblies on March 31, 1993. On the contract delivery date, a MICOM contract specialist contacted Mr. Ikard to inquire whether the Assemblies would be timely shipped. Mr. Ikard stated that IMCO "would not ship today nor did he know when it would. He said he was having some problems with the Government holding up his money...." (DAR 189, 191). On April 12, 1993, a MICOM contract specialist again contacted Mr. Ikard regarding delivery of the Harness Assemblies. The "[s]pecialist was told that he [Ikard] was not going to ship because the government has his money tied up and the QV lab had some of his parts. He further stated that until he got his money and the other problems resolved, he was not going to ship anymore purchase orders." (DAR 189, 191).

By letter of April 14, 1993, IMCO requested forbearance from MICOM in regard to "Contract No. DAAH01–92–P–1283." (DAR 189, 192). The language used in this letter suggests that IMCO considered this purchase order to be a contract.

By letter dated May 24, 1993, IMCO requested that purchase order 1283 be cancelled at no cost. On June 1, 1993, the CO

determined that it would be in the government's best interest to cancel the purchase order in its entirety at no cost to either party. This action was taken by the government on June 10, 1993.

Finally, purchase order 1365 was awarded to IMCO on September 30, 1992. This purchase order called for IMCO to supply 147 Electric Ring Assemblies for a total cost of $23,887.50. The entire quantity was scheduled to be delivered by September 1, 1993.

By letter of April 14, 1993, IMCO informed MICOM: "Reference is made to Contract No. 1365. The delivery schedule on this contract ... could become delayed" due to financial difficulties occasioned by IMCO's failure to receive anticipated settlement payments from the government on separate contracts. "We expect to be able sometime within the next 60 days to give you definite information as to the exact amount of delay if any that may occur." (DAR 244, 245). This language suggests that IMCO considered purchase order 1365 to be a contract.

By letter of August 6, 1993, MICOM informed IMCO that it had yet to receive any correspondence or information as per its April 14 letter. On September 7, 1993, Mr. Ikard responded to MICOM by saying:

Our 14 April 1993 letter was to alert you that we might have a problem and we had expected to be able to settle our pending negotiations before now. We still have not resolved these matters and it doesn't appear that we can come to a reasonable solution any time soon, promises notwithstanding.

For these reasons, we would appreciate it if you would cancel this order for us at no cost to either party.

(DAR 244, 247). On September 27, 1993, the government withdrew its offer and cancelled the purchase order in its entirety at no cost to either party.

IMCO's response to Gen. Cuthbert's debarment analysis is that it does not reflect consideration of its "present responsibility" at the time of debarment, as is contemplated by 48 C.F.R. §§ 9.407–1(a) and 9.406–2(c). IMCO argues its debarment is based only on a limited number of MICOM contracts, and

that this "snapshot" fails to consider its performance on other government contracts. It contends that Gen. Cuthbert ignored the fact that it had a less than ten percent delinquency rate on the 165 contracts and purchase orders that it had accepted between April 1991 and May 1994. It also argues that at the time of its performance of the nine purchase orders in question, it was plagued by both financial problems and production problems caused by an inept former contract manager. IMCO emphasizes that at the time of the proposed debarment, its performance rate was steadily improving.

IMCO contends that rather than relying on information regarding its improving financial condition, Gen. Cuthbert relied only upon isolated performance problems involving nine purchase orders, only two of which were ultimately terminated for default. Moreover, Gen. Cuthbert failed to give any weight to the fact that these default terminations were being challenged in this court on the grounds that MICOM was responsible for the majority of the performance related problems.

 The court concludes that there is sufficient evidence in the record to uphold the debarment. We find initially that IMCO's default on two contracts, given the contractor's explanation for non-performance and also considering its pattern of behavior on other purchase orders, is sufficient grounds for debarment. It is true that the fact that IMCO performed a large number of other purchase order contracts is relevant, as is the small size of the two defaulted contracts. However, the court does not review the debarment *de novo*. The limited question is whether, under all the circumstances, the debarment was unreasonable. It was not.

Gen. Cuthbert's rejection of IMCO's explanation for non-performance had adequate support in the record. He was faced with clear non-performance at a time when IMCO had a positive balance sheet. In finding in the Debarment Decision Memorandum that IMCO was financially capable of performing the nine purchase orders in question, Gen. Cuthbert relied upon two financial capability surveys conducted on IMCO. The first survey, conducted on May 4, 1992, was based upon financial information that was current through April 1992. This survey shows that IMCO had a net worth of $1,030,082, and working capital in the amount of $751,071. According to this first survey, IMCO's "acid test ratio" was 2.49 to 1. The second survey, conducted on June 23, 1993, relied upon financial information that was current through September 1992. This survey shows IMCO's net worth as $1,101,411, and working capital in the amount of $802,765. According to this second survey, IMCO's "acid test ratio" was 1.69 to 1.

The pre-award survey for B–0001 found that IMCO was financially capable of performing under its bid and that there was no adverse financial information that would preclude it from being awarded this proposal. This survey, conducted on October 5, 1993, was based on financial information current as of July 31, 1993, well after the nine purchase orders in question were accepted and performance was to have begun. Although IMCO's financial condition had deteriorated (its liabilities were $219,940, its total liabilities were $261,877, and its "acid test ratio" was 0.47 to 1), it still had substantial assets. According to this survey, IMCO had working capital in the amount of $472,381, and a net worth of $759,055. It also showed cash available of $91,387, accounts receivable of $12,248, inventory of $578,354, "other" current assets of $10,332, and total current assets of $692,321.

It was not unreasonable for Gen. Cuthbert to conclude that it would require little capital to perform these relatively small contracts. Moreover, there is an obvious tension between the evidence IMCO emphasizes—its later, poorer financial condition—and its argument that it was "responsible" in September 1994. If anything, IMCO's conceded financial deterioration by the time of the B–0001 solicitation tends to undercut its argument of "present responsibility." Nor was Gen. Cuthbert obligated to take into account monies IMCO might receive in the settlement. The monies were due, if at all, on different contracts. In accepting an obligation to perform some purchase orders, or by leading MICOM to think it would perform others, IMCO did not warn MICOM that its ability to perform was contingent. More-

over, as indicated earlier, the debarment official was not unreasonable under the circumstances in isolating IMCO's non-performance on these nine purchase orders from a series of disputes it had on other contracts.

■ Finally, even assuming that Gen. Cuthbert should have taken account of the likelihood of settlement of the court appeals, the result is not altered. The concept of "present responsibility" encompasses the contractor's ability to successfully perform a contract. *Delta Rocky Mountain Petroleum, Inc. v. United States Department of Defense,* 726 F.Supp. 278, 280 (D.Colo.1989). The simple fact that a contractor may be financially capable of performing a given contract does not necessarily make that contractor "presently responsible." Other factors are of necessity part of this determination. These include: the existence of performance problems on past contracts, the remedial measures taken by the contractor to ensure that the problems will not reoccur, the quality of management and administration in the contractor's business, and the contractor's present financial capability. *See Robinson v. Cheney,* 876 F.2d 152, 160 (D.C.Cir.1989); *Delta Rocky Mountain Petroleum,* 726 F.Supp. at 280; FAR 9.406–1(a); FAR 9.406–2(b)(1)(ii).

Gen. Cuthbert emphasized that a disturbing trend was evident from the record of the nine purchase orders in question, namely that in each case IMCO intimated to MICOM that it would satisfy the purchase order requirements and that it had the resources to perform these requirements, then, either after performance was due or at the eleventh hour, IMCO would inform MICOM of its inability to proceed. In light of these past performance problems, the court concludes that Gen. Cuthbert's determination that IMCO had a history of non-performance on one or more contracts and was "presently nonresponsible" at the time of the debarment was not arbitrary, capricious, or unsupported by substantial evidence.

### V. *Cancellation of IFB DAAH01–93–B–0001*

■ IMCO argues that MICOM's cancellation of B–0001 breached the government's implied contractual duty to fairly and honestly consider its bid. In light of the court's holding above that IMCO's debarment was not arbitrary and capricious, this argument lacks merit. Under FAR 14.404–1, the CO must reject a bid from a contractor who has been proposed for debarment. That debarment has now been sustained. Although IMCO has no standing to challenge the balance of MICOM's actions in view of its debarment, the court notes that the next lowest bidder, Tartan Industries, had gone out of business, and the remaining bids were determined by the CO to be either outdated or unreasonably high. Under these circumstances, the cancellation of B–0001 was in accordance with the applicable regulations. *See* FAR 14.404–1(c) (stating that invitations for bids may be cancelled when no responsive bid has been received from a responsible bidder).

### CONCLUSION

The decision to debar IMCO was not arbitrary and capricious or in violation of applicable law. It was based on substantial evidence. In the absence of any remaining responsive bids from responsible bidders, MICOM's cancellation of B–0001 was not improper. The request for permanent injunctive relief is therefore denied. The follow-on procurement may proceed. The Clerk is directed to enter judgment dismissing the complaint with prejudice. No costs.