**STAPP TOWING INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–548C.

United States Court of Federal Claims.

Sept. 27, 1995.

Jon N. Kulish, Washington, DC, for plaintiff. Joseph S. Wager, Haas & Najarian, of counsel.

Dorann E. Banks, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger for defendant. David Fishman, Small Business Administration, and Karen Schools, Defense Fuel Supply Center, of counsel.

### OPINION

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. At issue is whether a determination by the Small Business Administration denying a barge operator a Certificate of Competency should be upheld.

### FACTS

The following facts are drawn from the record developed before the Small Business Administration Certificate of Competency Review Committee, unless otherwise indicated. On November 16, 1995, the Military Traffic Management Command, Eastern Area ("MTMC–EA"), Bayonne, New Jersey, issued Solicitation No. DAHC21–95–B–0002 for the transportation of Department of Defense ("DOD")-owned jet fuel by barge from origins in the Gulf Coast area and lower Mississippi River to destinations along the inland waterways of the United States and the Gulf Coast area. MTMC–EA solicits and awards long-term contracts, standing route orders, and one-time spot movements for transportation of Government fuel on behalf of the Defense Fuel Supply Center ("DFSC"). The Defense Fuel Region–South ("DFR–S"), a subordinate activity of DFSC, coordinates the transportation of bulk fuel in the Gulf Coast Region and was the ultimate customer on the solicitation at issue. The contract was for a one-year period with two one-year renewal options.

On December 19, 1994, Stapp Towing Company, Inc. ("plaintiff"), submitted a bid in response to the solicitation and, through a sealed bid process, was determined the lowest bid received. Plaintiff's bid of $18,678,534.00 was lower by some $1,170,337.00 than the bid of Jar Assets, Inc., the next lowest bidder. Plaintiff previously was awarded almost identical fuel-towing contracts for the DOD and commercial entities for essentially the same services.

On December 22, 1994, in accordance with section M.3 of the solicitation, MTMC–EA requested a pre-award survey of all bidders in order to determine whether the bidders possessed the technical, administrative, and financial capability to perform the contract. Under the solicitation an unsatisfactory result of the pre-award survey is cause for rejection of a firm's bid. The prospective contractor has the burden of "affirmatively demonstrat[ing]" its responsibility. 48 C.F.R. ("FAR") § 9.103 (1994). The terms of section C.1.3 of the solicitation, entitled "Safety," require certain safety qualifications and mandate compliance with applicable regulations. Subsection C.1.3.1 requires the contractor to "establish and maintain an effective and comprehensive safety program that complies with" federal safety laws.

Subsection C.1.3.2 further requires the contractor to "maintain and operate all equipment in accordance with applicable U.S. Coast Guard regulations, federal and state laws, as well as cited military regulations, with particular regard to those military regulations promulgated by the Commander, Defense Fuel Supply Center." The Defense Contract Management Command ("DCMC") performed the pre-award survey of plaintiff, relying on information gathered by the Defense Contract Management Area Office ("DCMAO"), San Antonio, Texas.

As a result of its survey, DCMAO recommended that no award be made to plaintiff. Upon receipt of the adverse recommendation by the DCMAO pre-award survey team, Cynthia Schoner, the responsible MTMC–EA contracting officer, relied upon the recommendation and deemed plaintiff nonresponsible on the same grounds as contained in the DCMAO pre-award survey report. By letter dated March 22, 1995, Ms. Schoner notified plaintiff of the denial. Ms. Schoner stated that the company "lack[ed] ... an effective EPA compliance and safety program" and that, "[b]ased on the aforementioned pre-award survey, I have determined that you do not have a satisfactory performance record, you do not possess the necessary technical skills and your environmental/safety record is severely deficient." Ms. Schoner also noted that the safety checklist provided and the accident record presented did not constitute evidence of a demonstratively effective safety program.

Plaintiff disputes the rationale and specifics of Ms. Schoner's decision, contending that at all times it had available a satisfactory safety compliance program, *viz.*, a Coast Guard approved "OPA 90" document. Plaintiff submitted its OPA 90 document as its environmental safety program pursuant to section C.1.3.2 of the solicitation. Plaintiff asserts, and defendant agrees, that the OPA 90 was acceptable under the company's prior three-year contract for the same services (ending in late 1993); and, as the Small Business Administration (the "SBA") noted, plaintiff's plan was approved by the Coast Guard Districts in which it performed. Plaintiff disputes additional bases of the contracting officer's referral to the SBA, including findings of lack of documentation on personnel training and lack of required materials documentation. Plaintiff claims that the contracting officer required "perfection" as a past performance standard for issuance of the contract. Plf's Proposed Findings of Uncontroverted Fact Nos. 19–21, filed Sept. 14, 1995.

Central to Ms. Schoner's March 22, 1995 nonresponsibility decision was the frequency of spillage incidents involving plaintiff, its subsidiaries, and its subcontractors, as well as the total amount of fuel spilled as a result of the incidents. Ms. Schoner noted that the "Coast Guard has reported 81 violations on ... [plaintiff's] 17 vessels from October 1984 through November 1994. Approximately 50 percent of these violations were oil spills." Ms. Schoner further noted that between "March 1994 through July 1994, five out of eleven tows suffered leaks or spills—a 45% spillage rate."

Plaintiff was entitled, as a small business, to request an SBA determination of the company's responsibility under its Certificate of Competency ("COC") program. 13 C.F.R. § 125.5(a)(1) (1995). *See generally C & G Excavating, Inc. v. United States*, 32 Fed.Cl. 231, 236 (1984). Under the program the SBA makes a determination of a small business' responsibility to perform under a contract. After considering all aspects of a business' responsibility, the SBA determines whether or not to issue a COC. If the SBA issues the COC, the procuring agency must accept the SBA's responsibility determination as final. However, if the SBA declines to issue a COC, the contracting officer nevertheless may award the contract based on independent judgment and new information.

Upon determining that a small business is non-responsible, the contracting officer must notify the SBA of its determination. The agency then withholds award of the contract for up to 15 working days following receipt by the SBA of the notice of that determination. By letter dated March 28, 1995, the cognizant SBA regional office notified plaintiff, as required, of the availability of the COC program. The notification letter included detailed instructions concerning the

documentation that plaintiff should submit with its application. The SBA regional Office in Dallas, Texas ("SBA–TX"), was responsible for making the initial recommendation to issue or deny a COC to plaintiff. On April 4, 1995, plaintiff applied for a COC and included additional information in response to all items requested by SBA–TX. Plaintiff provided SBA–TX with an extensive supplement to its COC application on April 11, 1995, in an effort to address specific findings of the contracting officer. The SBA's COC review is based upon information provided by both the procuring agency and the small business offeror. 13 C.F.R. § 125.5(d)–(e) (1995). However, the obligation timely and clearly to establish a contractor's capability to perform a contract lies with the offeror. 48 C.F.R. § 9.103(c) (1994).

Independent of, but during the SBA–TX proceeding, DFR–S requested, and MTMC–EA agreed to convene, an independent freight review board pursuant to Army Reg. 55–355 due to various spillage events involving plaintiff. The board was to determine plaintiff's qualification to carry government fuel in the future. On March 28, 1995, a Carrier Review Board (the "CRB") was convened to determine whether a disqualification action should be taken against plaintiff as a result of its violation history. After hearing the evidence, the CRB decided to disqualify plaintiff for a period of 90 days. In connection with the MTMC–EA CRB proceedings, plaintiff, on March 28, 1995, presented to the MTMC–EA certain corrective actions and plans toward the goal of satisfying safety requirements and concerns for compliance with environmental standards. As a result of promises by plaintiff to take corrective action, the CRB suspended all but 30 days of the disqualification period and allowed plaintiff to continue transporting government fuel on a probationary basis through the middle of June 1995. In its letter dated March 31, 1995, the Carrier Qualification and Performance Branch of the Department of the Army stated:

> [B]ased on the corrective actions taken and proposed by ... [plaintiff], the Board decided to suspend the disqualification for 60 days.... If during the subsequent 60 calendar days ... [plaintiff] causes additional instances of failure to perform or unsatisfactory service, the suspended disqualification will be immediately vacated and the entire period of the suspended disqualification will become effective.

On May 9, 1995, during the probationary period, Inland Barge Company, a subcontractor of plaintiff, caused a spill in the Calcasieu River. As a result of the May 9, 1995 oil spill, the CRB vacated the suspended disqualification and reinstated the suspension, thereby disqualifying plaintiff from participating in transporting DOD freight for a period of 60 calendar days, commencing May 18, 1995, and continuing until July 17, 1995.

Following a June 5, 1995 meeting of the SBA–TX, COC Review Committee, two members of the board voted to award plaintiff a COC, and on June 6, 1995, the Regional SBA Office officially recommended issuing a COC for plaintiff. Based upon the May 9, 1995 fuel spill, David Martin, the COC industrial specialist, dissented and voted not to award a COC, citing plaintiff's "poor interim performance and poor performance for the last 12 months." On June 8, 1995, Captain Charles Thompson, Commander of DFR–S, requested that MTMC–EA appeal the recommendation of SBA–TX. MTMC–EA, through the Department of the Army Small and Disadvantaged Business Office, appealed SBA–TX's recommendation to SBA Headquarters, Washington, DC ("SBA–DC"), on July 18, 1995.

As part of the documentation provided to the SBA–DC, the MTMC–EA included the Coast Guard's Marine Violation Case reports documenting plaintiff's charged violations during the past two years. Plaintiff agrees that, between October 1984 and November 1994, the Coast Guard issued citations for approximately 81 violations of environmental and safety regulations, some 50 percent of which involved fuel spills. The administrative record also included information that between 1993 and 1995 plaintiff was charged with violations of the following regulations: 33 C.F.R. § 156.120, failure to comply with requirements for oil transfer; 33 C.F.R. § 155.760, failure to amend oil transfer procedures; 33 C.F.R. § 156.125, failure to stop

transfer after an oil discharge; 33 C.F.R. § 155.750, incomplete oil transfer procedures; 33 C.F.R. § 156.118, failure to provide advance notification of transfer operations; and 46 C.F.R. § 197.555, failure to meet the requirements for personal protective clothing and equipment. Over the eight months prior to the March 1995 suspension, plaintiff also received numerous letters of warning for alleged violations of federal regulations and operating procedures.

SBA–DC was also made aware of three separate occasions, between November 1994 and July 1995, on which plaintiff was placed on non-use status. Plaintiff regularly has disputed the course of events which led to each suspension. Central to plaintiff's contentions is a perceived pattern by Colonel John J. Carr, Commander, DFR–S, of citations based on unreasonable and incorrect interpretations of contract terms and applicable federal laws. Toward that end, plaintiff regularly challenged Colonel Carr's decisions and letters of warning, contending that the letters of warning artificially inflated plaintiff's violation record and gave it an unjustified appearance of rationality. Plaintiff also challenges much of the information before Ms. Schoner, the MTMC–EA contracting officer, the SBA–TX COC board, and the SBA–DC COC board. Specifically, plaintiff charges that the administrative record contains inaccuracies in both the number of environmental incidents and violations and the volume of fuel spilled. Plaintiff offered evidence during each level of review, as well as in this action, that contravenes the MTMC–EA–submitted estimates of fuel spill size in at least three specific incidents.

On August 9, 1995, SBA–DC's COC Review Committee issued its final determination denying plaintiff a COC. By letter dated August 9, 1995, John L. Bateman, acting area director for SBA–TX, informed plaintiff of SBA–DC's decision, listing the predominant reasons for denial, as follows:

1) [Plaintiff] has not completed the installation of fuel level gauges and alarms on the equipment it proposes to use on this COC. To date, only half the proposed equipment has been retrofitted.

2) [Plaintiff] indicated that they would initiate a Training/Safety Program utilizing a barge specifically purchased and earmarked for conversion for this purpose. This planned conversion has not taken place. Instead, the company is looking into utilizing the Texas A & M Marine facility for training purposes. However, this is also in the planning stage, and has not yet been incorporated into . . . [plaintiff's] training program.

3) [Plaintiff's] record of fuel spills associated with their performance on Government Contracts was found to be unacceptable. . . . [Plaintiff's] proposed corrective action measures as presented to the Military Traffic Management Command, Contractor Review Board in March 1995 to lower the incidence of spills has not been fully implemented (see 1 and 2 above). Current safety procedures have not proven effective.

In its Summary of COC Review Committee No. 1954, referencing meetings held on July 28 and August 7, 1995, SBA–DC noted:

The number of petroleum spills attributed to . . . [plaintiff] was the primary concern of the contracting officer (KO) and the reason for the COC referral. . . . [Plaintiff's] Safety Manual, ability to comply with EPA requirements and the availability of qualified/Coast Guard certified personnel have all been questioned by the KO. The KO's data shows that in the last 16 months, . . . [plaintiff] has had 12 spills involving Government fuel or movement.

In comparison, there was only one other spill reported for the same period by one other company. Although these spills were termed "minor" in nature (the Coast Guard considers spills of less than 10,000 GL minor), their frequency is of major concern to the KO. . . .

SBA–DC attempted to compare plaintiff's spill record with the norms of the industry, but was unable to due to a lack of information. "Plaintiff did not supply any objective evidence comparing their record with industry averages." Plaintiff's insurance company was also unable to provide such information, but did provide a loss record history to SBA–DC, although those records showed signifi-

cant defects in plaintiff's reporting records. As to the amount of fuel spilled, SBA–DC confusedly noted plaintiff's contentions that information provided by the Coast Guard, regarding the 1994 Goldline Refinery/Tyndall Air Force Base spill attributed to plaintiff, was flawed.[1] The committee stated that "[i]t is clear that the amount of product spilled is in dispute."

Defendant allows that plaintiff's OPA 90 document plan was acceptable as an environmental compliance program for the previous contract. However, SBA–DC found that, as a practical matter, plaintiff's written safety procedures had not proved effective in preventing violations, nor had its safety program lowered the incidence of fuel spills. SBA–DC did note the progress that plaintiff had made in complying with its promise to the CRB to take corrective safety actions, although all work had not been completed on the barges selected for this solicitation at the time of review.

Ms. Schoner was notified of SBA–DC's decision by letter on August 9, 1995, and did not act on it, thus effectively deeming plaintiff nonresponsible and ineligible for award of the contract. After plaintiff filed this action, the SBA agreed to withhold award until the date after the court heard argument. On September 21, 1995, the court advised the parties that plaintiff had not established by a preponderance of the evidence its entitlement to injunctive relief; that an interim order would issue at plaintiff's option, which was issued on September 22, 1995; and that an opinion would be filed this date.

## DISCUSSION

### 1. *Injunctive relief*

■ Plaintiff invokes the court's jurisdiction pursuant to 28 U.S.C. § 1491(a)(3) (1988 & Supp. V. 1993), which authorizes the court to issue injunctive relief in cases of pre-award bid protests. The benchmark for exercise of this jurisdiction is that "injunctive relief [is] awardable ... only in extremely

limited circumstances." *CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir. 1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir. 1983)); *Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 227 (1992).

The award of a permanent injunction is appropriate whenever a party can demonstrate by "a preponderance of evidence that the challenged action is irrational or unreasonable or violates an applicable procurement [statute or] regulation." *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 783 (1991) (citing cases). The court, however, should exercise its "equitable powers ... in a way which best limits judicial interference in contract procurement...." *Grimberg,* 702 F.2d at 1372.

■ The standard for a Court of Federal Claims review in a bid protest case, which is a suit for breach of an implied contract to treat the contractors bid fairly and honestly, is as follows:

A breach occurs in such situations if the contracting agency acts in an arbitrary and capricious, *i.e.,* irrational or unreasonable, manner in rejecting the bid. The ... [court] should be allowed to enjoin the agency from awarding contracts, and thereby interfere with the procurement process, "only in extremely limited circumstances."

*NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 376 (Fed.Cir.1986) (quoting *CACI, Inc.–Fed.,* 719 F.2d at 1581 [quoting *Grimberg,* 702 F.2d at 1372] (other citations omitted)). Alternatively, the contractor can establish a " 'clear and prejudicial' violation of a procurement statute or regulation." *CACI Field Serv., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (per curiam) (quoting *Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 394 (1984)). However, "if one thing is plain in this area it is that not every irregularity, no matter how small and immaterial, gives rise to the right to be compensated for

---

1. SBA–DC's summary document refers to "the 1994 Goldline Refinery/Tyndall AFB spill attributed to" plaintiff. The two spills, however, are separate events, occurring on May 9, 1995, and December 27, 1993, respectively. As noted below, plaintiff also disputes the accuracy of Coast Guard estimates on the May 21, 1994 spill at the Exxon Plantation. The identity of the spill that SBA–DC referred to is unclear.

the expense of undertaking the bidding process." *CACI Field,* 854 F.2d at 466 (quoting *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 573, 492 F.2d 1200, 1203 (1974) (*Keco II* )).

■ In cases where an arbitrary and capricious action is charged, "the standard of proof to be applied ... should be a high one...." *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970) (*Keco I* ); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971). As the United States Court of Appeals for the District of Columbia noted:

> If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations. Otherwise the courts would become the forum for all manner of objections to procurement decisions ... and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules....

*Steinthal,* 455 F.2d at 1301–02 (footnote omitted). Although the principle derives from cases evaluating the actions of contracting officers, it also can apply when evaluating the SBA's responsibility evaluation. The SBA, in the discharge of its duties relating to the COC program, may perform an identical responsibility analysis as the contracting officer. Therefore, in order to prevail when the SBA in effect is the final agency decisionmaker, which ultimately leads to a non-award of the contract, a contractor must establish that the SBA's COC decision of nonresponsibility had no rational basis or that, in making the decision, the SBA violated an applicable procurement statute or regulation in a manner prejudicial to the protesting bidder. Finally, certain deference must be accorded the unique expertise that SBA–DC unquestionably possesses in the area of business responsibility determinations. *Id.; see also Texas–Capital Contractors, Inc. v. Abdnor,* 933 F.2d 261, 264 (5th Cir.1990) (according great deference to SBA's interpretation and application of its regulation on qualifying as

small business); *C & G Excavating, Inc. v. United States,* 32 Fed.Cl. 231, 243 (1994).

■ Unquestionably, the Court of Federal Claims has jurisdiction to review the COC determination. *Cavalier Clothes, Inc. v. United States,* 810 F.2d 1108, 1110–12 (Fed. Cir.1987) (*approving Related Indus., Inc. v. United States,* 2 Cl.Ct. 517 (1983)). Although plaintiff contends that the contracting officer's finding of nonresponsibility and referral to the SBA were either irrational or contrary to regulation, the court does not review the decision to refer the matter to the SBA. *See C & G Excavating,* 32 Fed.Cl. at 240. Rather, plaintiff's challenges are leveled at the SBA's COC determination, both on the merits and with respect to the manner in which the underlying investigation was conducted.

### 2. *Decision for review*

The decision for review in this case is the final decision of non-responsibility by the contracting officer. Under 13 C.F.R. § 125.5(j), and FAR § 19.602–4, a contracting agency is bound by the SBA's determination to award the contract if the determination is in the contractor's favor, *i.e.,* if a COC is issued. The SBA regulations do not address the issue of the effect of a declination by the SBA to issue a COC on the authority of a contracting officer nonetheless to award a contract to the offeror. However, FAR § 19.602–4(a) provides such a procedure:

> If new information causes the contracting officer to determine that the concern referred to the SBA is actually responsible to perform the contract, and award has not been made ..., then the contracting officer shall reverse the determination of nonresponsibility, notify the SBA of this action, withdraw the referral, and proceed to award the contract.

The Federal Circuit has reconciled the relationship between the binding nature of the SBA determination found in FAR § 19.602–4(b) and the independence granted the contracting officer to consider new information found in FAR § 19.602–4(a):

> Subparagraph (b) [of FAR Sec. 19.602–4] is instructive in what it does not say. Although it explicitly states that COC's *are*

conclusive, nowhere does it suggest that the SBA's decision not to issue a COC is [similarly] conclusive.

*Cavalier Clothes,* 810 F.2d at 1113–12, n. 6. In this case the contracting officer exercised no such discretion since she did not consider new evidence and decide to award the contract to plaintiff; thus, the final decision for review is the denial of a COC by SBA–DC. Defendant's contention is incorrect that the action on review is solely the decision of SBA–DC COC determination. While the ultimate result is that the SBA decision will come under scrutiny, it is the consequence of the contracting officer's declining to take action.

Plaintiff argues that because the contracting officer originally based her non-responsibility determination upon the technical issue of the number and severity of spills for which plaintiff was responsible, as well as the adequacy of its environmental records, rather than the installation of fuel gauges and alarms, SBA–DC's responsibility determination should have been limited to these issues. However, SBA–DC was not bound to consider solely the information that formed the basis of the contracting officer's decision. *C & G Excavating,* 32 Fed.Cl. at 231; *see also DAE Corp. v. Engeleiter,* 958 F.2d 436, 438 (D.C.Cir.1992) (stating SBA decides "whether contractor meets the responsibility criteria"). Several decisions of the Comptroller General are in accord. *See, e.g., Astrodyne, Inc.,* B–231509.2, 88–2 C.P.D. ¶ 24, at 3 (holding that certificate of competency proceeding is not limited to consideration of issues raised by contracting officer); *F.W. Morse & Co.,* B–227995, 87–2 C.P.D. ¶ 396, at 3 (holding

that SBA may reasonably base its decision to decline award of COC on grounds other than those raised by contracting officer).

When the SBA makes a responsibility determination for purposes of deciding whether to issue a COC, it is not limited to the deficiencies cited in the referring agency's non-responsibility determination. Rather, the SBA may consider all aspects of responsibility that it considers germane. SBA–DC thus did not exceed its authority when it considered plaintiff's insufficient safety records, including the fuel gauges and alarms. It is therefore the decision of the SBA COC Committee issued on August 9, 1995, that is on review.

### 3. *Supplementation of the administrative record*

Plaintiff presented to the court documents and affidavits for the purpose of supplementing the administrative record developed before SBA–DC.[2] Defendant argues that only evidence already in the record is relevant to these proceedings.

Generally, when agency action is challenged, judicial review is limited to the existing administrative record. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1606, 84 L.Ed.2d 643 (1985). However, the scope of review in this case focuses on the discretion exercised by SBA–DC. Allegations of abuse of that discretion often require evidence extrinsic to the administrative record. In limited circumstances supplementation of the administrative record may be permitted. Some exceptions to the general rule limiting review to the adminis-

---

**2.** Primarily, plaintiff seeks to introduce two affidavits of David E. Cole, a maritime industry consultant and plaintiff's expert. Mr. Cole opines in his first affidavit that plaintiff has an "exemplary record for a company" in the towing industry and that plaintiff had an extremely low number of oil spills. Affidavit of David E. Cole, Aug. 17, 1995, ¶ 6. Mr. Cole also considers that some of the "accusations made against ... [plaintiff] have no basis in law or the ordinary practice of the industry ..." *id.* at ¶ 7, including accusations regarding certified personnel, number of leaks, and lack of safety programs. *Id.* at ¶¶ 7(a)–(c).

In his second affidavit, Mr. Cole gave his own interpretation of oil spills disputed by plaintiff,

including the December 27, 1993 Tyndall Air Force Base spill and the May 21, 1994 Exxon Plantation spill, and termed the spills "minor." Affidavit of David E. Cole, Sept. 11, 1995, ¶¶ 5–7. Mr. Cole also disputed certain accusations against plaintiff, including the lack of certified personnel, the lack of a training program, and the lack of high fuel level alarms. *Id.* ¶¶ 8(a)–(c).

Plaintiff also offered the court three affidavits by John Barr Stapp, President of plaintiff. Mr. Stapp's affidavits make similar contentions regarding safety requirements and the accuracy of reported spills, as well as industry standards. Finally, plaintiff submitted an affidavit of Carl R. Bradley, Vice President of plaintiff, for similar purposes.

trative record have been recognized under the following circumstances:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency actions shows whether the decision was correct or not; .... (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir. 1989); *see also IMCO v. United States,* 33 Fed.Cl. 312, 317 (1995). To the extent these exceptions are implicated in plaintiff's challenge to the accuracy of the information relied on by the SBA, the court will consider plaintiff's extra-record showings.

After reviewing the documents that plaintiff seeks to have added to the record, the court concludes that supplementation of the administrative record is unhelpful. The court ultimately finds that no relevant information originally submitted to SBA–DC was ignored or improperly evaluated and that the reasons for the decision to deny a COC are expressed in the notice of August 9, 1995. Although much of the evidence offered by plaintiff highlights burning disputes between plaintiff and the MTMC–EA regarding fuel spill estimates, plaintiff submitted similar information to SBA–DC. The affidavits are also significant for what is not included, namely comparative data. While plaintiff's expert David E. Cole states that plaintiff "has a superior record for compliance with the marine safety and environmental protection laws," Affidavit of David E. Cole, Sept. 11, 1995, ¶ 11, he does not refer to any independently compiled data. Similarly, no data were presented to the SBA–DC COC Review Committee other than charts prepared by plaintiff itself. The additional information is not substantial enough to negate rationality, nor is it the type of information that SBA–DC could have ignored without

rendering the decision arbitrary and capricious.

4. *Decision of the SBA COC review committee*

On August 9, 1995, SBA–DC issued its final decision denying plaintiff the requested COC. Ms. Schoner, the contracting officer, did not exercise her discretion to consider new information and reverse SBA–DC. As a consequence, plaintiff was deemed nonresponsible and therefore not entitled to award of the contract. Plaintiff then filed this action challenging the basis of the SBA's decision, arguing primarily that SBA–DC erred in relying on certain information. Plaintiff also contends that two of the bases for the SBA–DC decision were not required by the contract, the solicitation, or federal regulations. In plaintiff's view these errors and irrelevant requirements warrant a finding that SBA–DC acted arbitrarily and capriciously and that the decision to deny the COC lacked a rational basis.

It is helpful to once again note that the appropriate decision for review is the final decision of SBA–DC, *i.e.,* the decision of the COC Review Committee, not the initial nonresponsibility decision by the contracting officer, the initial SBA review by SBA–TX, or even the suspensions issued by the MTMC–EA CRB, although SBA–DC may legitimately take cognizance of the rationale employed in past actions. By issuing a COC, SBA–DC has the ability to mandate award of the contract, although the contracting officer retains power to award the contract if a COC is denied. Thus, while the court nominally reviews the final decision of the contracting officer, in this case the contracting officer made no decision beyond that issued by SBA–DC.

The final decision by SBA–DC, as explained through its final memorandum and meeting summary, is not the ideal manifestation of cogency that facilitates judicial review. However, what emerges from these documents, supplemented by the administrative record, is a pattern of concern over the sheer number of incidents and violations involving plaintiff. SBA–DC took pains to note particular interest in the pattern of incidents

and violations, establishing sufficient concern to form a rational basis for its decision.

In its final decision, SBA–DC specifically cited to three reasons for denying a COC, discussed seriatim below. The importance placed by SBA–DC on remedial measures is not substantially outweighed by concern over incidents and violations and did not form the sole basis of the opinion.

### 1) *Fuel gauges and alarms*

SBA–DC, in its August 9, 1995 letter of denial, stated that plaintiff "has not completed the installation of fuel level gages [sic] and alarms on the equipment it proposes to use on this COC. To date, only half the proposed equipment has been retrofitted." Plaintiff contends that the "SBA had no rational basis for its COC determination that ... Plaintiff was required to have fully implemented the retrofit of barges with fuel level alarms and gauges." Plf's Br. filed Sep. 14, 1995, at 28. Plaintiff argues that the gauge and alarm program was undertaken voluntarily; that it was not a required part of the contract, solicitation, or federal law; and that plaintiff was working on an MTMC–EA approved timetable.

Plaintiff is correct in each of its assertions as to whether the installation was required under the contract, solicitation, or federal law. However, SBA–DC's concern was not based on the remedial program, but rather on plaintiff's future potential to reduce or eliminate its performance problems. SBA–DC acknowledged the voluntary nature of the actions by noting "that this equipment is not a requirement for this procurement but is an action being taken by ... [plaintiff] to reduce the possibility of future spills...." As compliance with environmental regulations was a required element of the solicitation and contract, a past record of noncompliance is a legitimate concern for SBA–DC. SBA–DC thus concluded that the presence, or lack thereof, of gauges and alarms was critical to satisfaction of plaintiff's potential for compliance.

As of the date of the SBA–DC decision, the voluntary installation of gauges and alarms was not complete. On August 4, 1995, SBA–DC determined, by speaking to John B. Stapp, president of plaintiff, that only about half of the nine barges the company selected for this procurement had been retrofitted. Although all equipment was on order and work expected to be compete by the end of August, SBA–DC was forced to make a decision for the immediate award of a contract. The program was undertaken to avoid repetition of the spill that occurred on May 9, 1995. Without complete preventive measures, a repeat occurrence remained a foreseeable event. Environmental compliance, especially with stated contractual safety requirements and a potential contractor's ability to meet those requirements, constitutes a legitimate concern for SBA–DC. Plaintiff's inability to satisfy SBA–DC's legitimate concern regarding future fuel spills forms an underlying rational basis of the decision. Thus, the record indicates that, based upon the status of gauge and alarm installation, SBA–DC reasonably determined that the incomplete program may affect negatively the company's future competency.

### 2) *Training barges*

SBA–DC also referred to a "Training/Safety Program" undertaken by plaintiff that required the use of a special barge. The program required either the purchase of the barge or the use of a similar one. Plaintiff argues that SBA–DC exceeded its authority in considering plaintiff's promises regarding the barge, thus rendering the decision irrational, arbitrary, and capricious.

Plaintiff once again is correct in arguing that the training barge was not a requirement of the solicitation, contract, or federal regulation. However SBA–DC had similar concerns with the lack of a training program as with the incomplete fuel gauge and alarm program. The terms of the solicitation provide that the carrier must meet certain safety qualifications. Specifically, section C.1.3.2 of the solicitation requires the contractor to "maintain and operate all equipment in accordance with applicable U.S. Coast Guard regulations, federal and state laws as well as cited military regulations, with particular regard to those military regulations promulgated by the Commander, Defense Fuel Supply Center."

Plaintiff assured SBA–DC that it did have an adequate safety program to ensure compliance with the safety requirements of the solicitation. In response to the incidents leading up to the CRB suspension, plaintiff voluntarily undertook a new safety and training program. This program included the use of a training barge. Since acquisition of the barge was not yet complete by the time of SBA–DC review, the committee noted concern about the prospects of future environmental compliance. SBA–DC stated: "[Plaintiff's] proposed corrective action measures as presented to the ... [MTMC CRB] in March 1995 to lower the incidence of spills ha[ve] not been fully implemented...."

Given that the SBA–DC review was taking place in August 1995, the lack of progress on the training program was a legitimate concern for SBA–DC. Nevertheless, plaintiff argues that it was "complying, in good faith and on a schedule known to be reasonable, with a commitment to complete and use a training barge...." Plf's Br. filed Sept. 14, 1995, at 30. Plaintiff misses the point in arguing that completion of the program was on schedule. While plaintiff and Colonel Carr may have been in accord as to the timetable, scheduled completion in December 1995 went well beyond the award date of the contract. The evidence of plaintiff's frequent violations reasonably illustrated to SBA–DC that any current safety program was not effective and that plaintiff's compliance would benefit from use of the barge. The present failure to reach that goal constituted legitimate concern for SBA–DC.

### 3) *Fuel spills*

As its final reason, SBA–DC stated that plaintiff's "record of fuel spills associated with their performance on Government Contracts was found to be unacceptable." SBA–DC then referenced the incomplete voluntary safety measures (noted as reasons 1 and 2), and concluded that "[c]urrent safety proce-

dures have not proven effective." Plaintiff counters on two fronts. First, plaintiff argues that it long had an effective safety program in place, namely the OPA 90 document. Second, plaintiff argues that Coast Guard estimates of certain spills, relied on by SBA–DC, are so flawed as to render the decision arbitrary and capricious.

SBA–DC's decision evidences a general concern with the environmental "record" compiled by plaintiff over the last decade. Specific reference is made, in the memorandum accompanying the SBA–DC decision, to the contracting officer's concerns with "[t]he number of petroleum spills" and the fact that "in the last 16 months, ... [plaintiff] has had 12 spills involving Government fuel or movement." The number of spillage incidents is a legitimate consideration. Additionally considered was the volume of fuel spilled in various incidents, and SBA–DC noted concern about a particular incident.[3] SBA–DC attempted to compare plaintiff's compliance record with that of the industry by requesting records of industry standards from plaintiff itself and plaintiff's insurance carrier. Neither was able to provide such documents, and objective comparative evidence is missing from the administrative record.

Plaintiff first takes issue with the SBA–DC's contentions about an effective safety program. Plaintiff asserts that at all times that it had a Coast Guard-approved OPA 90 document which, together with its equipment maintenance program, constitutes an adequate EPA compliance and safety program and satisfied past contract solicitations. Plaintiff further alleges "a Coast Guard violation record better than possessed by most in this industry and, as described by Plaintiff's expert, a record which is 'exemplary.'" Plf's Br. filed Sept. 14, 1995, at 19.

As to an effective environmental safety program, it is undisputed that plaintiff received a total of 81 violations within the last ten years. Plaintiff's safety program also

---

**3.** SBA–DC refers to the "1994 Goldline/Tyndall AFB spill." Neither the Goldline nor the Tyndall Air Force Base spills, which are separate spills, occurred in 1994. Had SBA–DC solely relied on the amount of fuel spilled, this confusion might render the decision on review arbitrary. SBA–DC certainly has the duty to bespeak a clear

rationale behind its decision. However, SBA–DC did not entirely rely on the amount spilled, but was concerned about the frequency of the spills and plaintiff's ability, given current incomplete remedial measures, to reduce the overall number of events and comply with applicable regulations.

failed to prevent it from violating a long list of regulations, summarized above. Plaintiff now argues that such a record, including 12 spills in the last 16 months, is well within the acceptable margin of error for the industry as a whole. Although such information might prove to be true, the proper forum to address this contention in the first instance was SBA–DC, not this court. Plaintiff failed to provide SBA–DC with requested industry comparative data. The committee also attempted to get such data from plaintiff's insurer. However, not only was plaintiff's carrier unable to provide the information, it did not even have accurate records of plaintiff's environmental incidents. SBA–DC found that, as a practical matter, plaintiff's safety procedures have not proved effective in preventing violations, nor has its safety program been able to lower the incidence of fuel spills.

Next, plaintiff hotly contests estimates relied on by SBA–DC for three particular spills.[4] The estimates made by the Coast Guard, and noted by defense, paint a picture of enormous oil spills. Plaintiff offers credible evidence, mainly through affidavits, that these estimates are extraordinarily inflated. Specifically at issue are the May 9, 1995 Gold Line spill into the Calcasieu River (plaintiff alleges a total spilled of 40 to 50 gallons, while defendant presents documents supporting a 100– to 200–gallon range); the May 21, 1994 Exxon Plantation spill (plaintiff alleges five gallons spilled, while defendant offers proof of a 13,146–gallon spill); and the December 27, 1993 Tyndall Air Force Base spill (plaintiff offers evidence of 50 to 840 gallons, and defendant notes at least 13,000 gallons).

As to the volume of the oil spills, plaintiff is asking the court to review the volume of each of the disputed violations *de novo*. The court cannot undertake a *de novo* review; rather, its focus is on whether the evidence before SBA–DC was substantial. Plaintiff's showing establishes that the information indicating the total volume of fuel spilled by plaintiff was unreliable or in conflict. After reviewing the record, given all information

provided by plaintiff and MTMC–EA, the SBA–DC review committee concluded: "The company's record of fuel spills associated with their performance on Government Contracts was found to be unacceptable." Plaintiff does make credible arguments that the estimates presented to SBA–DC for each of the contested spills is seriously flawed. If SBA–DC based its denial of a COC on the spillage volume alone, the decision could not stand. However, that is not the case. SBA–DC manifested concern with the frequency of spills, not the volume. Indeed, SBA–DC noted that the volume of one spill was in dispute. *See* note 3 *supra.* Between December 1993 and March 1995, DFR–S records show 19 leaks and spills associated with movements of government fuel. All but one of these leaks was attributed to plaintiff. The number of incidents associated with plaintiff provided the primary concern for SBA–DC and constituted a reasonable and rational basis for denying a COC.

To find the SBA's decision arbitrary and capricious, the court would be required to rule that even the low level of spills alleged by plaintiff is insignificant. To do so, without comparative data or information on the importance of each spill, would amount to a decision that the volume of spills overall was de minimis. This is an area of expertise reserved to the SBA. Although credible evidence is offered for plaintiff's position as to particular incidents, the record does not reveal that SBA–DC either ignored plaintiff's evidence or solely relied on the disputed oil spills in reaching its decision.

### 6. *Bid preparation costs*

■ Expenses incurred in preparing bid proposals are normally a cost of doing business that are lost "when the effort to obtain the contract does not bear fruit...." *Lincoln Servs., Ltd. v. United States,* 230 Ct.Cl. 416, 417, 678 F.2d 157, 158 (1982); *see also E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123, 133 (1995). A disappointed competitor, however, may recover the costs of preparing its unsuccessful bid if it establishes that the

---

4. Plaintiff also contests most of the other spill data, contending that the volume per the records is actually 1,016 gallons and that at trial plaintiff

could prove that the amount spilled was under 250 gallons.

procurement official's award decision was arbitrary and capricious. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 597 (1980); *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203; *see also E.W. Bliss*, 33 Fed.Cl. at 133. The four criteria used in making a determination whether "an agency's award is arbitrary and capricious" similarly are used to make a determination as to whether bid preparation costs are appropriate. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04; *see also E.W. Bliss*, 33 Fed.Cl. at 133.

■ Plaintiff has not shown by a preponderance of evidence that SBA–DC's decision denying a COC was arbitrary and capricious. Absent such a showing, plaintiff is not entitled to an award of bid preparation costs. Such costs are a normal part of business and necessary to the competitive bidding process, a process that would falter if every unsuccessful bidder were entitled to costs.

Plaintiff is not entitled to an award for barge clean-up costs, also incurred in preparation for the contract. Section L. 18 of the solicitation notes that "[t]he Contractor will prepare barges for inspection at its own expense." As part of the pre-award survey, plaintiff undertook an admittedly expensive process of cleaning its barges, a cost to the company of nearly $200,000.00. However, as the contract states, and the case law affirms, bid preparation costs lie with the unsuccessful bidder and are not recoverable. Plaintiff's request for bid preparation costs, including barge clean-up costs, is denied.

### 7. *Debarment*

■ Plaintiff claims in its cross-motion for summary judgment "the existence of a *de facto* debarment." Plf's Br. filed Sep. 14, 1995, at 9; *see also* Plf's Br. filed Aug. 18, 1995, at 18 (alleging "Defendant effected a *de facto* debarment of the company"). For support, plaintiff relies upon the holding in *Related Industries v. United States*, 2 Cl.Ct. 517, 525 (Fed.Cir.1983). In *Related Industries* a contractor was rejected for lack of integrity, tenacity, and perseverance, as well as a poor performance record. The court ruled that the contractor was deprived of due process when the contracting officer specifically barred the contractor from bidding

upon certain government contracts and all future contracts. The SBA's determination in plaintiff's case contains none of these elements.

In this case SBA–DC's non-responsibility decision was based upon a lack of competence, rather than a lack of integrity. No statements were made by either the contracting officer or the SBA restricting plaintiff's eligibility for future contracts. Further, plaintiff does not allege that the SBA deviated from its normal procedure or that plaintiff was not allowed to submit additional information regarding its performance for SBA–DC's consideration. Plaintiff has failed to make a showing that the non-responsibility determination was part of a pattern of behavior by the Government that led to a *de facto* debarment. No evidence appears of a systematic effort by the procuring agency to reject all of the bidder's contract bids. Absent a showing of such deviation or pattern of conduct directed at plaintiff, this court is in no position to find that the MTMC–EA's conduct constitutes a *de facto* debarment.

The court is aware of the recent letter to plaintiff from Francis A. Galluzzo, Assistant Deputy Chief of Staff for Operations, Transportation Services, MTMC, in which plaintiff was not deemed the low bidder on a similar contract. In this letter Mr. Galluzzo alluded to the findings of the MTMC–EA and the SBA in this case and subtly indicated their importance in future responsibility determinations. Although this letter gives pause to the court, and is improvident at best, Mr. Galluzzo's actions are not now properly before the court and not a basis of this decision. The letter either by itself, or in conjunction with the other evidence, does not signify a *de facto* debarment.

### CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted, and plaintiff's cross-motion is denied. The Clerk of the Court shall dismiss the amended complaint.

IT IS SO ORDERED.