**GRAPHICDATA, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**News Printing Company, Inc.,
Intervenor–Defendant.**

No. 97–256C.

United States Court of Federal Claims.

May 9, 1997.

Richard D. Lieberman, Washington, DC, for plaintiff. J. Randolph MacPherson, Sullivan & Worcester, L.L.P., of counsel.

Robert E. Leidenheimer, Jr., Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

William J. Spriggs, Washington, DC, for intervenor-defendant. Edward W. Gray, Jr., and Christopher E. George, Gray, Blount & Associates, L.L.P., of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on defendant and intervenor's Joint Motion for Summary Judgment. The protestor initiated this post-award action seeking injunctive relief restraining the Government from proceeding with performance of a contract for printing patents. The issue is whether the Government's providing the awardee with government-furnished property not listed in the invitation for bids constitutes a material modification requiring the termination and resolicitation of the contract after the awardee returned the government-furnished property to the Government and refused to sign the proposed contract modification.

## FACTS

Plaintiff, GraphicData, LLC ("plaintiff" or "GraphicData"), is a limited-liability company that provides printed products to commercial and government customers. Since 1987 plaintiff has printed patents for the Patent and Trademark Office (the "PTO") pursuant to a series of contracts with the Government Printing Office (the "GPO").[1] Plaintiff's most recent contract with the GPO expired on April 22, 1997. The gravamen of plaintiff's cause of action is that the GPO violated its own regulations and basic principles of fair bidding when it provided the awardee, intervenor News Printing Company, Inc. ("NPC" or "intervenor"), with an electronic file that was not listed in the invitation for bids (the "IFB") as government-furnished property. The court first discusses the patent printing process and next the procedural history of this case. Unless otherwise noted, the facts are not disputed.

### 1. The patent printing process

Pursuant to the terms of the GPO Program D306S, patents are printed in weekly "issues." Each issue contains approximately 2,400 patents. A printed patent is made up of three types of pages: (1) a cover/title page(s), which contains an abstract of the patent; (2) a drawing page(s), which contains a drawing(s) of the invention; and (3) a text page(s), which contains a full description of the patented device. Program D306S contractors print patents in two different formats referred to, respectively, as "soft copy" and "hard copy." Patents in soft copy format are printed on standard 8.5" by 11" paper, and patents in hard copy are printed on paper that is longer, narrower, thicker, and stiffer than standard 8.5" by 11" paper. The pages of a soft copy patent are printed on both sides.[2] The title page(s) and drawing page(s) of a hard copy patent only are printed on one side.[3] For each patent the PTO typically orders 33 soft copies and eight hard copies.

---

1. The GPO contracts with private parties in order to meet the requirements of the PTO. The printing of U.S. patents is known as Program D306S.

2. The printing profession refers to pages printed on both sides as "duplexed" pages.

3. The printing profession refers to pages printed on only one side as "simplexed" pages.

The D306S contractor does not use a conventional printing press to meet the PTO duplication requirements. Instead, the contractor receives, on a weekly basis, an 8mm tape(s) that contains in postscript format each of the patents included in that week's issue. The printer uses Xerox equipment to print the patents contained in the 8mm tapes on the appropriate size paper.

At the same time as the contractor receives the weekly 8mm tape(s), the contractor also receives a paper document known as a "Patent Issue Master Closeout List" (a "PIMCL"). The PIMCL informs the contractor, by patent number, of certain patent format information such as the number of (1) title pages, (2) drawing pages, and (3) text pages. The contractor uses the PIMCL to produce the "invoice support listing." The invoice support listing is a report that the contractor is required to produce on a weekly basis detailing the types and quantities of patents that were printed in a given week. The contractor does not produce the invoice support listing until after the printing of the weekly issue is completed.

The patent format information contained in the PIMCL also can be stored in computer format. The parties refer to the computerized patent format information as the "electronic file." Plaintiff contends that the electronic file allows the contractor to greatly streamline the printing process and to reduce its costs of performing the contract with the GPO. While conceding that the patent format information contained in the electronic file may be relevant to printing hard copy patents, defendant and intervenor counter that "[r]eceipt of the 'Electronic File' does not by itself permit the automation of the printing process because the 'patent format information' on the 'Electronic File' cannot simply be fed into the Xerox printers." Def's & Int's Br. filed Apr. 18, 1997, at 8–9. They explain that, before the electronic file can automate the printing process, the contractor first must write two computer programs, one that extracts the patent format information from the electronic file and one that connects the

patent format information with the 8mm tapes.

### 2. *History of the solicitation*

The instant dispute arose from a solicitation for the printing of patents issued by the GPO on July 24, 1996. At the time of the solicitation, plaintiff was the incumbent contractor for Program D306S. The solicitation, issued in the form of an invitation for bids, provided for a bid opening date of August 24, 1996. IFB(I) [4] stated that the patents would be furnished to the contractor on 8mm exabyte tapes and that the low bidder, as a prerequisite to a responsibility determination, would be required to produce copies of 100 patents from a government-furnished tape.

According to plaintiff, IFB(I) indicated that the GPO would make available to the awardee the following government-furnished property ("GFP"): (1) "Camera Copy" for Certificates of Correction, Dedications, Disclaimers, Adverse Actions and Special Certificates; (2) Opaque overlay copy; (3) on occasions, some camera copy for reprints; (4) photoprints; (5) preaddressed mailing label sets; (6) two computer-generated lists for each patent issue, one for hard copies (printed on 25% Rag Ledger) and one for soft copies (printed on white offset book and also furnished on 3.5" disk); (7) subscription list on 3.5" disk; (8) computer generated list of the copy for all Certificates of Correction; and (9) notices of withdrawn patents by telefax.

The GPO opened the bids for IFB(I) on August 21, 1996. The GPO identified NPC as the low bidder with a bid of $2,977,731.00, and plaintiff as the second low bidder with a bid of $3,064,439.00. On August 22, 1996, Jack Marken, the contracting officer, received two letters from plaintiff. The first letter requested that the GPO allow plaintiff to correct a mistake in its bid concerning plaintiff's prompt payment discount. The second letter requested the GPO to increase the amount that the GPO had added to NPC's bid for evaluating travel and per diem

---

**4.** Because the GPO ultimately canceled the July 24, 1996 IFB and issued a new IFB on November 4, 1996, the court refers to the July 24, 1996

IFB as "IFB(I)" and the November 4, 1996 IFB as "IFB(II)."

costs for an on-site government representative and for evaluating the cost of delivering government-furnished materials. Mr. Marken informed plaintiff by letter dated September 18, 1996, that he was denying all of plaintiff's requests. Plaintiff subsequently filed a protest with the Government Accounting Office (the "GAO") on September 26, 1996. *See GraphicData, L.L.C.,* B–2744773.1 (Sept. 26, 1996). The protest reiterated the same objections that plaintiff had made to Mr. Marken. Pursuant to 31 U.S.C. § 3553 (1994), the GPO stayed award of the contract while plaintiff's protest was pending.

On September 26, 1996, the GPO conducted a pre-award survey of NPC. According to plaintiff, Gerry Groeber, one of the members of the pre-award survey team and a PTO Quality Assistance Specialist, took exception to NPC's pre-award test due to the fact that employees of the Xerox Corporation, a subcontractor for NPC, rather than employees of NPC, performed the pre-award test. IFB(I) specifically prohibited the use of subcontractors. Plaintiff contends that, upon realizing that NPC employees had not performed the pre-award test, Mr. Groeber advised the GPO survey team members that NPC had not proved that it was a responsible contractor. Despite Mr. Groeber's alleged comments, the GPO found NPC to be responsible on October 3, 1996.

On October 23, 1996, the GPO advised bidders that it was canceling the solicitation opened on August 21, 1996, and that it would issue a new solicitation. The GPO cited significant changes in the PTO's requirements as the reason for the cancellation. Because the GPO canceled IFB(I), the GAO dismissed GraphicData's September 26, 1996 protest as moot. On November 4, 1996, the GPO issued a new solicitation for Program D306S with a bid opening date of November 27, 1996 (IFB II). Although the new solicitation contained revised requirements for the number of patents to be printed, the specifications in the new solicitation were quite similar to the specifications in IFB(I). IFB(II) required the low bidder to complete satisfactorily a pre-award test, identical to the test set forth in IFB(I), prior to a responsibility determination. Like IFB(I), IFB(II) stated that the

GPO would provide the awardee with 8mm exabyte tapes containing the patents in electronic form and with other GFP that was identical to the GFP to be provided in IFB(I).

On November 18, 1996, NPC filed a protest with the GAO contending that some of the terms in IFB(II) were unsatisfactory. On November 27, 1996, R.R. Donnelley Co., a printer that had not submitted a bid in response to IFB(I), also filed a protest claiming that the terms of IFB(II) were overly restrictive. Under the sponsorship of the GAO, an Administrative Dispute Resolution conference was held on December 19, 1996, in an attempt to resolve the pending protests. Representatives of plaintiff, NPC, R.R. Donnelley, the GPO, and the PTO attended the conference. The conference resulted in Mr. Marken's amending IFB(II) to address the respective concerns of the parties. Subsequently, NPC and R.R. Donnelley withdrew their GAO protests.

The GPO extended the bid opening date of IFB(II) from November 27, 1996, to January 23, 1997. Upon opening the bids on January 23, 1997, the GPO determined that NPC was the low bidder with a bid of $2,173,605.00 and that plaintiff was the second low bidder with a bid of $2,364,324.00.

Beginning on January 27, 1997, plaintiff filed three new protests with the GAO. Plaintiff's protests claimed that (1) the contracting officer had waived the pre-award test requirement in IFB(II) for NPC, and the GPO intended to award the contract to NPC, despite the fact that NPC could not pass the pre-award test; (2) NPC's inability to comply with the IFB(I) pre-award test on September 26, 1996, in combination with the GPO's approval of that test, constituted an act of bad faith that extended into IFB(II); (3) the GPO had attempted to influence the IFB(II) responsibility determination by excluding Mr. Groeber, who had alerted his fellow IFB(I) pre-award survey team members of NPC's deficiencies, and all other PTO employees from the IFB(II) pre-award survey team; and (4) GPO's pre-award survey team for IFB(II) was not qualified. The GAO dismissed all three of plaintiff's protests on February 25, 1997. The GAO found that 1)

the GPO invited the PTO to participate in the IFB(II) pre-award survey and therefore the GPO did not exclude the PTO from the pre-award survey; 2) the record "unequivocally" demonstrated that NPC successfully completed the IFB(II) pre-award test; and 3) the selection of the pre-award test review panel was within the discretion of the GPO. *GraphicData, L.L.C.,* B–274773.5; B–274773.6; B–274773.7 (Feb. 25, 1997).

The GPO awarded a contract to NPC on February 26, 1997. NPC was to receive its first 8mm tapes and begin its printing production cycle for the April 29, 1997 issue of patents on April 10, 1997.

### 3. *Facts concerning the electronic file*

On March 24, 1997, Mr. Groeber, the PTO in-house liaison at the Program D306S contractor, suggested to Leroy Daniel Corbin, the Vice President of Digital Services for NPC, that the GPO might be able to supply NPC with an electronic file detailing the number of title pages, illustration pages, and text pages per patent. Mr. Groeber mentioned the possibility of NPC's obtaining the electronic file after he learned that the hard copy/advance order list supplied by the GPO contained errors. Acting upon Mr. Groeber's suggestion, Mr. Corbin wrote to Richard Weiss, the GPO Contracting Officer's Technical Representative, on March 24, 1997. Mr. Corbin's letter stated, in pertinent part:

> While discussing some data issues related to the 306S, we have come to realize that the PTO may be able to forward an additional electronic file that would prove to be beneficial for NPC. This file could contain additional information and be more accurate than Currently being supplied. The additional file would contain the following data:
>
> Patent Number
>
> Number of cover pages
>
> Number of text pages
>
> Number of drawing pages
>
> Mr. Groeber suggested that NPC make a formal request to you for this electronic

file. Assuming this file is something that PTO will be able to supply, the file should be supplied in ASCII text format and be received by NPC on or before PWD [Prior Workday] 14.[5]

On March 27, 1997, Mr. Groeber asked Al LePera, plaintiff's D306S Program Manager, why plaintiff had never made a request to the GPO for the electronic file. Lorenzo T. Berry, plaintiff's Director of Information Services, replied on March 28, 1997, telling Mr. Groeber that plaintiff had requested the electronic file in 1995 when the GPO first began using 8mm exabyte tapes for furnishing patents to the D306S contractor. Mr. Berry explained that the GPO had prohibited plaintiff from requesting the electronic file from Reed Technology and Information Services ("RTIS"), the PTO contractor that prepares the 8mm tapes. During his conversation with Mr. Groeber, Mr. Berry asked whether the GPO now intended to provide NPC with the electronic file. Mr. Groeber told Mr. Berry that RTIS was awaiting an official request for the tape before proceeding any further.

On April 2, 1997, 35 days after contract award, the GPO drafted a second modification to its contract with NPC ("Mod 2"), which states, in pertinent part: [6]

> 3. On page 15 of 32, under GOVERNMENT TO FURNISH, add the following: The Government shall provide the following patent print information in an electronic file: Patent Number; Number of cover pages; Number of text pages; and Number of drawing pages. The file will be supplied in an ASCII text format. It will be available along with the paper copy on the same day that the patent print tape is picked up.

Mod 2 contains the signature of Jack Marken, the D306S Contracting Officer. Although NPC had not signed the modification, NPC gave no indication during the hearing on plaintiff's application for a temporary restraining order that the modification would be rejected.

---

**5.** Prior Workday 14 is April 10, 1997, the day NPC received its first 8mm tapes.

**6.** The first modification does not concern the electronic file and therefore is not relevant to the case at bar.

### 4. *Summary of litigation in the United States Court of Federal Claims*

On April 7, 1997, plaintiff filed an application for a temporary restraining order and a motion for a preliminary injunction with the Court of Federal Claims. Plaintiff sought to enjoin the GPO from acquiring printing services from any bidders other than Graphic-Data. Plaintiff's request for injunctive relief was based on two counts: 1) By providing NPC with the electronic file after the award of the contract, the GPO did not treat all bidders fairly [7]; and 2) the GPO improperly excluded Mr. Groeber from the IFB(II) pre-award survey.[8] On the same day NPC filed a Motion To Intervene pursuant to RCFC 24. The court granted NPC's motion on April 7, 1997.

On April 8, 1997, the court held a hearing on plaintiff's application for a temporary restraining order. The court took testimony from three witnesses, Messrs. Berry and Corbin and Kenneth Margulies, the Chief Executive Officer of GraphicData. *See infra* pp. 779–780 (discussing propriety of holding evidentiary hearing under Tucker Act bid protest jurisdiction). Mr. Berry testified that had the GPO listed the electronic file as GFP in IFB(II), plaintiff would have lowered its bid significantly. According to Messrs. Berry and Margulies, the electronic file would have allowed plaintiff to use three, instead of five, DOCUTEC machines [9] and to reduce its work force by 40–50%. Mr. Berry explained:

But I'm telling you now on this witness stand under oath that if I were armed with that information [the electronic file], I could take that tape, feed that tape directly into one of the new model DOCU-PRINTS which have succeeded the DO-CUTEC and I could then feed that directly into that machine.

I could then use a piece of firmware, which is a combination of hardware and software. That's why it's called firmware. And utilizing something called XGF, I could feed to the printer that electronic file which is simply an ASCII, for American Standard Code Information Interchange, and ASCII is simply binary numbers, zeros and ones.

I could feed that information to the printer of the DOCUTEC. And as I'm feeding that postscript tape in, I now tell the printer of the DOCUTEC which pages I want to be one sided and which pages I want to be two sided. And I'm off and running with no special process for what we call "McLedger."

Mr. Corbin disagreed with Mr. Berry's assessment of the electronic files. He testified that the electronic file, as provided to NPC by the GPO, would not facilitate significantly the automation of the patent printing process. He explained that the patent format information contained in the electronic file was not in a workable ASCII format. To take advantage of the information provided in the electronic file, a programmer must

---

**7.** In support of its unfair treatment count, plaintiff directed the court's attention to the Government Printing Office Printing Procurement Regulation ch. I, § 6(2)(a)-(b) (Oct.1990), which provides:

 a. *Definition of "Property."* As used in this regulation "Government-furnished property" is property in the possession of the Government and subsequently delivered or made available to the prime contractor performing under contract with GPO for printing, binding, and related services. GFP includes, but is not restricted to, binders, camera copy (including artwork, reproduction proofs, etc.), negatives, printed matter, labels, bills of lading, paper. book cloth, manuscript copy, transparencies, type, and stored data on reels or disks.

 b. *Policy on furnishing material.* It is PPD policy that-excluding printing media such as copy, tapes, negatives, etc.-contractors will fur-

nish all material required for the performance of GPO contracts for printing, binding, and related services. However, the GPO shall furnish material to a contractor when it is determined to be in its best interest by reason of economy, standardization, availability, expediting production, or other appropriate circumstances. Material to be furnished by GPO shall be described in the solicitation in sufficient detail to permit evaluation by bidders.

**8.** Plaintiff's pleadings actually contain three counts, although the third count is identical to the first count. Plaintiff voluntarily dismissed its second count on April 17, 1997, so only Count I is before the court for consideration.

**9.** A DOCUTEC machine is a high-speed publication system manufactured by the Xerox Corporation which prints copies at the speed of 135 pages per minute.

write an extraction program. Mr. Corbin also indicated that NPC currently was not using the electronic file and had not signed the GPO's proposed modification that would include the electronic file as GFP.

The court denied plaintiff's application for a temporary restraining order, finding that plaintiff had not established a substantial likelihood of success on the merits, because either the regulation requiring the GPO to list all GFP in the solicitation, Government Printing Office Printing Procurement Regulation ch. I, § 6(2)(b) (Oct.1990), was not violated, as it was not intended to address this situation, or, if it was, plaintiff had not shown that the use of the electronic file would afford the awardee an advantage, such that plaintiff was prejudiced. Pursuant to RCFC 65(a)(2), the court consolidated plaintiff's motion for preliminary injunction and complaint for a permanent injunction. By order entered on April 9, 1997, as amended on April 10, 1997, trial was scheduled.

On April 16, 1997, counsel for defendant and intervenor announced their intention to file a joint motion for summary judgment, arguing that plaintiff's cause of action was moot because NPC had never signed the modification which included the electronic file as GFP. The parties agreed that the best course for resolving the issue raised by movants would be to postpone trial and to put in place an expedited summary judgment briefing schedule.

## DISCUSSION

1. *Standard and scope of review*

In 1996 Congress amended the Tucker Act, 28 U.S.C. § 1491 (1994), to grant the Court of Federal Claims jurisdiction to entertain post-award bid protest actions. *See* 28 U.S.C.A. § 1491(b) (West Supp.1997). Prior to the amendment, the Court of Federal Claims had jurisdiction to decide pre-award bid protest actions under the theory that by soliciting bids the Government impliedly promises to consider all bids in a fair and honest manner. *New Am. Shipbuilders v. United States,* 871 F.2d 1077, 1079 (Fed. Cir.1989); *NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 375–76 (Fed.Cir.1986); *Nation-*

*al Forge Co. v. United States,* 779 F.2d 665, 667 (Fed.Cir.1985). Jurisdiction over post-award bid protests, however, had been exclusively in the hands of the United States district courts. The district courts premised their jurisdiction over post-award bid protest actions on section 10 of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 702 (1994). *See Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 872 (D.C.Cir.1970).

The 1996 amendment to the Tucker Act gives the Court of Federal Claims and the district courts concurrent jurisdiction to decide both pre-award and post-award bid protest actions. The amendment directs the courts to apply the standard of review set forth by the APA:

(b)(1) Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

. . . .

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C.A. § 1491(b).

While the amendment to the Tucker Act presents the Court of Federal Claims with post-award bid protest actions for the first time, it does not change judicial review of a bid protest action. Under its prior pre-award bid protest jurisdiction, the Court of

Federal Claims, per the direction of the Federal Circuit, found a breach of implied contract, and thus a violation of the procurement process, where "the contracting agency acts in an arbitrary and capricious, *i.e.,* irrational or unreasonable, manner in rejecting the bid." *NKF Eng'g,* 805 F.2d at 376; *CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983). In order to obtain injunctive relief, a frustrated bidder was required to establish, by a preponderance of the evidence, that the agency's actions 1) were without a reasonable basis, or 2) violated an applicable procurement statute or regulation. *See CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (per curiam); *National Forge,* 779 F.2d at 668; *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 782–83 (1991) (citing *Tackett & Schaffner, Inc. v. United States,* 224 Ct.Cl. 530, 536, 633 F.2d 940, 942 (1980)). Under its new jurisdiction to hear both pre-award and post-award bid protest actions, the Court of Federal Claims can hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ..." 5 U.S.C. § 706(2)(A); *see* 28 U.S.C.A. § 1491(b)(4).

The standard of review applied by the Court of Federal Claims in pre-award bid protests cases is identical to the standard now imposed on the court by the amendment to the Tucker Act. This is not surprising given that the Federal Circuit has found that "Congress intended the Claims Court [now the Court of Federal Claims] to have the same authority over suits by unsuccessful bidders (brought before the contract was awarded, *Grimberg,* 702 F.2d at 1369) that the district courts had under *Scanwell.*" *CACI Inc.–Federal,* 719 F.2d at 1573 (citing S.Rep. No. 275, 97th Cong., 2d Sess. 23 (1981), *reprinted in* 1982 U.S.C.C.A.N. 11, 33, and H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981)).

Just as the 1996 amendment to the Tucker Act does not change the standard of review to be applied to bid protests, the amendment does not alter the scope of the Court of Federal Claims' inquiry. Under its pre-award bid protest jurisdiction, the Court of Federal Claims generally limited its review to the facts before the administrative agency at the time the contested action was taken. *See Stapp Towing Inc. v. United States,* 34 Fed. Cl. 300, 307 (1995) (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985)). However, the Court of Federal Claims did not apply an iron-clad rule automatically limiting its review to the administrative record. Instead, the court permitted supplementation of the administrative record:

(1) when the agency action is not adequately explained in the record before the court;

(2) when the agency failed to consider factors which are relevant to its final decision;

(3) when an agency considered evidence which it failed to include in the record;

(4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

(5) in cases where evidence arising after the agency actions show whether the decision was correct or not; ...

(8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Stapp Towing,* 34 Fed. Cl. at 307–08 (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir. 1989)); *see IMCO, Inc., v. United States,* 33 Fed. Cl. 312, 317 (1995) (containing similar language), *aff'd,* 97 F.3d 1422 (Fed.Cir.1996); *Bradley v. United States,* 26 Cl.Ct. 699, 701 (1992) (same), *aff'd,* 1 F.3d 1252 (Fed.Cir. 1993) (Table); *Simons v. United States,* 25 Cl.Ct. 685, 694 n. 17 (1992) (same), *aff'd,* 17 F.3d 1444 (Fed.Cir.1994) (Table). In post-award bid protest cases governed by *Scanwell* and the APA, federal district courts have taken the same approach as the Court of Federal Claims with regard to the scope of their review of agency actions. *See Esch,* 876 F.2d at 991.

■ No reason exists to presume that Congress, in granting the Court of Federal Claims jurisdiction to entertain post-award bid protest actions, intended to impose upon the court an absolute rule limiting review to the administrative record. The 1996 amendment to the Tucker Act, for example, does not preclude the Court of Federal Claims from deciding post-award bid protest cases

where the alleged improper agency conduct either occurred after the award of the contract or where the agency relied on materials not in the administrative record. While a disappointed bidder does not have the right to have a federal court substitute its judgment for that of the administrative agency, the bidder does have the right to introduce appropriate evidence to allow the court to determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

With this understanding of the APA in mind, a judge confronted with a bid protest case should not view the administrative record as a immutable boundary that defines the scope of the case. Initially, the judge should determine whether the agency action before the court is susceptible to a record review. If the answer is yes, the judge must limit review to the record. If the answer is no, however, the judge should recognize the long lineage of cases recognizing the need to supplement the administrative record in certain circumstances. As Judge Bruggink explained in *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349 (1997) (citation omitted) (emphasis added):

> [T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision. This is a presumption necessitated by the limited nature of the court's inquiry. As a practical matter, however, in most bid protests, the "administrative record" is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review. This is true in the contract award context if for no other reason than that, due to the absence of a formal record, the agency has to exercise some judgment in furnishing the court with the relevant documents. *In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action, It follows that discovery as well as the breadth of the court's review has to be tailored in each case. Whether testimony is needed to frame the issues is likewise dependent on the particular circumstances.* Consequently, this court has adopted a flexible approach both in putting together the evidence that will be considered and in discovery, balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as the four corners of the inquiry.

The facts of the case at bar illustrate why the Court of Federal Claims and the district courts have allowed for supplementation of the administrative record. Plaintiff's complaint alleged that the GPO violated its own procurement regulations and basic principles of fair solicitation when, after awarding NPC the contract, it provided NPC with the electronic file, which was not listed as GFP in IFB(II). Limiting the court to the administrative record effectively would prevent the court from determining whether the GPO's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To rule on plaintiff's request for temporary injunctive relief, the court had to inquire into the utility of the electronic file. The response to this question would not be contained in any administrative record.

### 2. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Seal–Flex, Inc. v. Athletic Track and Court Const.*, 98 F.3d 1318, 1321 (Fed.Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). The moving party bears the initial burden of establishing the absence of any disputes of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). "When the movant has met its initial burden, the non-movant must respond

with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." *Id.* The Supreme Court has emphasized that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....' " *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (citation omitted).

### 3. Contract modifications and their effect on the competitive bidding process

Generally, disappointed bidders asking a federal court to enjoin performance of a contract base their request on some action of the procuring agency or the awardee that occurred during the solicitation process. Plaintiff, however, does not take issue with the GPO's decision to award the D306S contract to NPC. Instead, plaintiff challenges the GPO's post-award offer to modify the contract to include the electronic file as GFP. To resolve plaintiff's claim, the court must consider to what extent the federal policy of competitive bidding limits an executive agency's ability to modify a procurement contract.

The Competition in Contracting Act (the "CICA") requires executive agencies procuring property or services to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A) (1994). In *AT & T Communications, Inc. v. WilTel,* 1 F.3d 1201 (Fed.Cir.1993), a disappointed bidder challenged a bilateral modification to a telecommunications contract between the General Services Administration and the awardee, contending that the modification violated the CICA's competition requirement. *Id.* at 1202–03. The Federal Circuit explained that the "CICA ... does not prevent modification of a contract by requiring a new bid procedure for every change. Rather, only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *Id.* at 1205; *see Executive Bus. Media, Inc. v. United States,* 3 F.3d 759, 764 (4th Cir.1993); *Cray Research, Inc. v. De-*

*partment of Navy,* 556 F.Supp. 201, 203 (D.D.C.1982); *American Air Filter Co.,* 57 Comp. Gen. 285, 286 (1978).

Because the CICA does not contain a standard for determining whether a modification falls within the scope of the original contract, the Federal Circuit drew an analogy to the "cardinal change" doctrine. *See AT & T,* 1 F.3d at 1205. Under the cardinal change doctrine, a contractor is not bound by an agency's unilateral modification to a procurement contract where the modification "effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Id.* (quoting *Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 409, 569 F.2d 562, 563–64 (1978)). Just as the cardinal change doctrine prohibits an agency from compelling a contractor to perform contract terms that are not within the scope of the original bargain, the CICA prevents an agency from modifying a contract to such an extent that the modified contract is "materially different" from the contract for which a competition was held:

> The cardinal change doctrine asks whether a modification exceeds the scope of the contract's change clause; this case [involving CICA] asks whether the modification is within the scope of the competition conducted to achieve the original contract. In application, these questions overlap. A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's change clause.

*AT & T,* 1 F.3d at 1205 (citation omitted).

Whether the CICA's competition requirement prohibits the modification of a procurement contract depends on whether the original contract and the modification call for "essentially the same performance." *Executive Bus. Media,* 3 F.3d at 763 n. 3. If so, the disappointed bidder has suffered no harm because the awardee is not receiving any benefits without fair competition. If, however, the modification materially changes the scope of performance, the disappointed bidder has a legitimate grievance because the agency is awarding a new and different contract without allowing the disappointed bid-

der to compete. *See American Filter Co.*, 57 Comp. Gen. at 286.

### 4. *Actual modification requirement*

 Defendant and intervenor argue that they are entitled to judgment as a matter of law because NPC did not accept the GPO's proposed modification, did not use the electronic file to print patents, and returned the electronic file to the GPO. They maintain that no material change to the original competed contract can occur unless the original contract is modified:

> The existence of a contractual modification providing the "Electronic File" to NPC is a threshold issue in this case. Plaintiff does not cite, and we are unaware of, any case holding that a contract must be rebid where a modification was considered but rejected. Plaintiff cites a number of cases that stand for the proposition that rebidding is required where a post-award material modification amounting to a "cardinal change" in the contract occurs.... Absent such a modification, however, the winning bidder is simply performing the contract as bid and there has been no disadvantage to anyone. As demonstrated below, no modification with respect to the "Electronic File" occurred. Accordingly, there is no possibility that "cardinal change" has occurred, and plaintiff—under the precedent it relies upon—has no cause of action.

Def's & Int's Br. filed Apr. 18, 1997, at 13–14 (citation and footnote omitted).

Plaintiff counters that whether or not an actual modification to the original contract occurred is not dispositive:

> The Government reaches for a basis for summary judgment, and latches on to the legal status of the modification. This entire approach misses the point. The issue is that NPC wanted the Electronic File, NPC requested the File, and the Government (i.e., the Contracting Officer) went to great lengths to draft and sign a modification that provided the Electronic File to NPC. The Government and NPC were so certain that they would issue this modification that they provided a "test" Electronic File at NPC's request so that NPC could

use it. Why was all this happening? The reason can only be that both NPC and the Government believed the Electronic File was useful, helpful, and would make NPC's production more efficient—precisely why GraphicData wanted the file, and precisely why it should have been called out as GFP in the IFB. The issue for trial is *why did NPC request the Electronic File, why did GPO and PTO provide it to NPC and how would this file aid in printing patents*, not whether or not the Contract with NPC was formally modified and signed by NPC.

Plf's Br. filed Apr. 24, 1997, at 9–10.

Federal bid protest law strikes a balance between two principles—an agency's autonomy in making procurement decisions and the bidders' right to equal treatment by the procuring agency. Federal agencies "are entrusted with a good deal of discretion in making procurement decisions." *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994) (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993), and *Tidewater Management Servs. Inc. v. United States*, 216 Ct. Cl. 69, 84, 573 F.2d 65, 73 (1978)). To ensure that agencies do not abuse this discretion, Congress empowered the Court of Federal Claims and federal district courts to override the *agency* decision-making process when a disappointed bidder proves that an agency action was unreasonable or in clear and prejudicial violation of a statute. *See* 28 U.S.C.A. § 1491(b) (West Supp.1997).

 Plaintiff essentially asks the court to view the D306S contract as if it had been modified and to determine whether the hypothetical modification prejudices plaintiff. In the event the court finds the hypothetical modification prejudicial, plaintiff requests that the court enjoin the contract and require the GPO to resolicit the contract. If plaintiff's suggested approach were adopted, the court would exceed its limited review powers and would tread into an area reserved for agency discretion. By imposing a modification on the parties to a procurement contract, the court substitutes it views of the agency's procurement needs for that of the agency. If the Government and awardee actually modify

a contract, the court can review the modification to ensure that it does not violate the CICA, *see* AT & T, 1 F.3d at 1205, but the court cannot rewrite a solicitation to include a modification not agreed to by the parties to the original contract. *See Lockheed Missiles,* 4 F.3d at 959; *Data Gen. Corp. v. United States,* 915 F.2d 1544, 1551 (Fed.Cir. 1990). Consequently, the court upholds the position of defendant and intervenor that a disappointed bidder protesting an alleged modification must prove that an actual modification occurred.

■ Attempting to avoid this holding, plaintiff *urges* that, because NPC did not reject the proposed modification until after plaintiff filed an application for a temporary restraining order, judicial review is warranted:

> The Government's and NPC's actions subsequent to the filing of GraphicData's Complaint and Application for a TRO ("to withdraw" the modification) reflect poorly on both of those parties, for they are an obvious attempt to erase without actually changing an improper and unfair action by the GPO. The facts are that NPC requested a modification and GPO issued one and signed it. Only after ... GraphicData's action was instituted in this Court did the Government and NPC decide to "negate" that modification in an attempt to defeat GraphicData's claims.

Plfs Br. filed Apr. 24, 1997, at 9 n. 6. While the court agrees with plaintiff that the GPO's issuance of the proposed modification only 35 days after the contract was awarded and NPC's rejection of the proposed modification only after plaintiff filed its lawsuit create the appearance of impropriety, the facts of the case at bar do not warrant judicial scrutiny of the agency's decision-making process. Contrary to plaintiff's argument, the proposed, but rejected, modification did not prejudice plaintiff. An actual modification that exceeds the scope of the original contract harms disappointed bidders because the modification prevents the disappointed bidders from competing for what is essentially a new contract. *See AT & T,* 1 F.3d at 1205. In this case plaintiff had a full and fair opportunity to compete for the same contract that NPC currently is performing.

The court does not rule out the possibility that, in the future, a case may arise wherein justice requires creating an exception to the actual modification requirement. Given the fact that the proposal and subsequent rejection of the modification did not prejudice plaintiff, the court does not believe the convenient timing both of the proposed modification and NPC's rejection of it justifies fashioning an exception that blurs the lines between agency discretion and judicial review. As the United States District Court for the District of Columbia Circuit explained, " 'Courts should be reluctant to intervene absent a clear showing of illegality by the party attempting to overturn the agency determination.' " *Cray Research Inc.,* 556 F.Supp. at 203 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1303 (D.C.Cir.1971)).

5. *Effect of proposed modification on the original contract*

■ Assuming, *arguendo,* that an exception were recognized to the actual modification requirement, plaintiff must prove that the proposed modification was outside the scope of the original contract. Defendant and intervenor contend that NPC requested the electronic file to double check the accuracy of data contained in the 8mm tape, not to automate its printing process:

> 9. News Printing has never used the "electronic file" in any way in the production of patents. News Printing was, and is, printing patents without use of the "electronic file."
>
> 10. Although News Printing did not need the "electronic file" to print patents, we were interested in examining the file to determine if it could be used as a quality control check on the data being extracted from the 8mm tape. News Printing's interest in quality control of the data stemmed from its being told that the hard copy/advance file contained flawed data.

Second Declaration of Leroy Daniel Corbin, Apr. 18, 1997, ¶¶ 9–10. Defendant and intervenor also argue that the electronic file

would not allow a printer to automate its printing process.

Although plaintiff put forth a *prima facie* case that use of the electronic file would enable significant cost savings, plaintiff fails to raise a genuine issue of material fact concerning NPC's ability to use the electronic file to automate its printing process. Plaintiff apparently agrees that the electronic file would not have altered NPC's method of printing patents:

> The Court must conclude that NPC's bid on Program D306S would not have been affected in any way by the inclusion of a statement in the Solicitation that the Electronic File would be provided as GFP. Mr. Leroy Corbin, the NPC Vice President in charge of D306S testified at the TRO hearing that the Electronic File was of no use whatsoever to NPC, and NPC had no intention of using it. TRO Tr. at 100. This is NPC's view of the value of the Electronic File *after* NPC had experimented with the printing of 200 Test Patents, plus one complete issue of test patents. TRO Tr. at 116. Because it rejects the Electronic File as not useful, it is beyond cavil that NPC may not now claim that, had the Electronic File been specified as GFP in the solicitation, it would have factored in savings when preparing its bid.

Plf's Br. filed Apr. 17, 1997, at 2 n. 2.

"The basic standard [in a bid protest case involving a modification] is whether the modified contract calls for essentially the same performance by the contract when originally awarded so that the modification does not materially change the field of competition." *Cray Research, Inc.*, 556 F.Supp. at 203; *see AT & T*, 1 F.3d at 1205. The field of competition is changed where the modification allows the awardee to perform the contract in a manner that disappointed bidders could not have anticipated from the terms of the solicitation. *See Bangar Contractors Corp.*, B–24007 1. 90–2 CPD 295 (Oct. 16, 1990) ("To make such a modification [that exceeds the scope of the original contract] to a contract awarded to [the awardee] ... under the terms of the IFB as Written would be prejudicial to the other bidders on the IFB since it would be essentially a sole-source award of the new requirements to the contractor, thereby circumventing the competitive procurement statutes."). Where a modification does not change how an awardee performs a contract, the modified contract calls for the "same performance" as the original contract and the disappointed bidder is not prejudiced.

The record on summary judgment reveals that NPC requested the electronic file for a limited purpose—to ensure the accuracy of the data in the 8mm tapes. Mr. Corbin testified, and plaintiff did not dispute, that the electronic file did not affect NPC's method of patent production. The modification therefore did not change how NPC performed its contract. Short of offering some evidence that the electronic file would allow NPC to alter its printing process, plaintiff could not succeed at trial. Plaintiff failed to proffer such evidence. Although plaintiff may speculate about what its expert could establish at trial, the non-moving party "may not rest upon mere allegation or denials of his pleading," Anderson, 477 U.S. at 256, 106 S.Ct. at 2514; *see Litton Indus. Prods. Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed.Cir.1985), or on argument of counsel. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed.Cir.1984); *see Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir. 1984) (noting that opponent of summary judgment must point to evidentiary conflict on record by counterstatement or affidavit).

## CONCLUSION

 Although the trajectory of this protest altered during the proceedings when intervenor rejected the modification, the court endorses a bright-line test rule that a modification must be effective, i.e., signed by both the awardee and the contracting officer, before a cause of action lies for breach of the duty of fair dealing by materially modifying a contract after award.[10]

10. All other arguments made by plaintiff that are not discussed specifically have been considered carefully and found to be without merit.

Accordingly, based on the foregoing, defendant and Intervenor's Joint Motion for Summary Judgment is granted. The Clerk of the Court shall enter judgment for defendant and intervenor.

**IT IS SO ORDERED.**

No costs.